### SHELDON et al. v. METRO–GOLDWYN PICTURES CORPORATION et al.

District Court, S. D. New York.
Dec. 29, 1938.

O'Brien, Driscoll & Raftery, of New York City (Arthur F. Driscoll, Edward C. Raftery, Edward J. Clarke, T. Newman Lawler, and Sidney G. Rosenbloom, all of New York City, of counsel), for complainants.

J. Robert Rubin, of New York City, for defendants Metro-Goldwyn Pictures Corporation and Metro-Goldwyn-Mayer Distributing Corporation.

Leopold Friedman, of New York City, for defendant Loew's, Inc.

Samuel D. Cohen, of New York City (John W. Davis, Samuel D. Cohen, Earle L. Beatty, and J. Paschall Davis, all of New York City, of counsel), for defendant Culver Export Corporation.

LEIBELL, District Judge.

Complainants, Edward Sheldon and Margaret Ayer Barnes, instituted this suit against the defendants, Metro-Goldwyn Pictures Corporation, Metro-Goldwyn-Mayer Distributing Corporation, Loew's, Inc., and Culver Export Corporation alleging that the defendants in making, distributing and exhibiting their motion picture "Letty Lynton" appropriated and infringed upon complainants' dramatic composition "Dishonored Lady". The case was tried and the complaint dismissed. D.C., 7 F.

Supp. 837. The decree of the District Court was reversed on appeal, 2 Cir., 81 F. 2d 49. The concluding paragraph of the appellate court's opinion provides [page 56]: "The decree will be reversed and an injunction will go against the picture together with a decree for damages and an accounting. The plaintiffs will be awarded an attorney's fee in this court and in the court below, both to be fixed by the District Court upon the final decree."

On the mandate of the Circuit Court of Appeals an interlocutory decree was entered in this Court wherein it was adjudged that the defendants had infringed complainants' copyright by copying complainants' dramatic composition, by manufacturing therefrom the motion picture "Letty Lynton", by distributing the motion picture and by exhibiting it for profit. The decree directed: "4. That the complainants recover of the defendants and each of them all damages sustained by them and that the complainants recover of the defendants and each of them all gains and profits made by the defendants and each of them because of the said infringement upon complainants' copyright by copying said dramatic composition or by making the said motion picture 'Letty Lynton' and by their use and trafficking in, or in any manner dealing with the said motion picture 'Letty Lynton', or in any rights thereto or by giving public performances thereof, or causing, licensing, aiding and abetting or in any other manner assisting in the giving of public performances thereof, or in any other way, form or manner whatsoever."

A special master was named in the decree "to ascertain and report the amount of complainants' damages herein and the amount of such gains and profits of the defendants and each of them and in addition, the said Special Master shall report separately the amount of such gains and profits of the defendants, obtained from all sources outside of the United States".

The decree also enjoined defendants from exhibiting the motion picture, directed that the defendants recover their costs and disbursements and that this Court retain jurisdiction for various purposes and to determine the amount to be awarded the complainants for attorney's fees.

This motion brings up for consideration the report of the special master and the exceptions filed thereto, the application of the special master for compensation for his services and the request of the complainants that they be allowed a reasonable counsel fee for services rendered by their attorneys.

On the hearings before the special master the complainants offered no proof of damages but sought an accounting of all the profits the defendants made from the infringement. Copyright Act, 17 U.S.C.A. § 25. The special master's report is a volume of eighty-seven printed pages. It is an excellent report. He sets forth the gross sum ($1,655,269.15) realized from the sales and exhibition of the motion picture and the various elements of cost of production, distribution and exhibition, totaling $1,067,-664.78, which he found to be proper as deductions in determining the net profits of $587,604.37, the defendants made from the infringement.

The special master in his report states:

"1. Apparently, from the testimony before me, the motion picture business divides itself into three distinct parts or operations;

"(a) Production, or making of the picture, including hiring of cast and securing of sets, costumes, literary material, the actual photography, (generally referred to as 'shooting' the picture), and the development of the picture.

"(b) Distribution, which includes the leasing of positive prints of the picture to theatre owners or operators (generally referred to as exhibitors), for exhibition in their respective theatres. Distribution is generally made through a corporation maintaining branches (referred to as exchanges) in the different key cities throughout the country; and

"(c) Exhibition, or the actual showing of the picture on the screen to the public by the owner or operator of a theatre.

"2. The motion picture Letty Lynton was produced by Metro-Goldwyn-Mayer Corporation. It was thereafter turned over to Metro-Goldwyn Pictures Corporation at cost. Metro-Goldwyn Pictures Corporation turned over the picture to Metro-Goldwyn-Mayer Distributing Corporation for domestic distribution, upon an arrangement whereby the Distributing Company was to pay to the Pictures Corporation 80% of the gross receipts or proceeds received from the rental of said picture to exhibitors (Defendants' Exhibits 17, 18, 19).

"Thereafter the Distributing Company rented the picture to exhibitors throughout

the United States and its possessions, and paid to Metro-Goldwyn Pictures Corporation 80% of the gross receipts (Defendants' Exhibit 19).

"The picture was also turned over by Metro-Goldwyn Pictures Corporation to Culver Export Company for foreign distribution, and to Regal Films, Ltd., for Canadian distribution. Culver Export Corporation in turn distributed it abroad (excepting Canada)' through wholly owned foreign subsidiaries (except in Sweden), which in turn paid to Culver Export Corporation a percentage of the gross receipts varying with the different foreign subsidiaries (Defendants' Exhibits 17, 20, 21).

"3. The picture was distributed in Canada through a contract with the Regal Films, Ltd., a Canadian corporation, not owned or controlled by any of the defendants, and the proceeds received by the Pictures Corporation from said Regal Films, Ltd., are accounted for by the Pictures Corporation (Defendants' Exhibits 18, N. Y.S.M., 375).

"4. A separate account has been filed by each defendant named in this action.

"An account was filed by Metro-Goldwyn Pictures Corporation which included the 80% of the rentals received by Metro-Goldwyn Pictures Corporation from the Metro-Goldwyn-Mayer Distributing Corporation, and took as a deduction against said rentals, the cost of the making of the picture by the Producing Company (Defendants' Exhibit 18).

"An account was filed by Metro-Goldwyn-Mayer Distributing Corporation which accounted for the 20% of the gross rentals retained by the Distributing Corporation (Defendants' Exhibit 19).

"An account was filed by the Culver Export Corporation which accounted for the part of the proceeds derived from foreign distribution received by Culver Export Corporation from its foreign subsidiaries (Defendants' Exhibit 20).

"An account was filed on behalf of the foreign subsidiaries which accounted for the portion of the gross receipts from foreign rentals retained by those foreign subsidiaries (Defendants' Exhibit 21).

"An account was filed by Loew's, Inc., which accounted for the profits of all of the Loew Theatres in which the said picture was exhibited (Defendants' Exhibits L-6-L-13, both inclusive).

"5. The corporation organization chart as of August 31, 1932, appears as Defendants' Exhibit 17. This shows that Loew's, Inc., owned at that time 100% of the stock of the MGM Company, Inc., and that the MGM Company, Inc., owned 100% of the common stock of Metro-Goldwyn Pictures Corporation. The Metro-Goldwyn Pictures Corporation preferred stock was listed on the New York Stock Exchange and about 10% of it was owned by Loew's Inc. Metro-Goldwyn Pictures Corporation in turn owned all of the capital stock of the Metro-Goldwyn-Mayer Distributing Corporation (domestic distributer), Metro-Goldwyn-Mayer Corporation (producer) and the Culver Export Corporation.

"6. The decree above quoted instructs the Special Master to 'report separately the amount of such gains and profits of the defendants obtained from all sources outside of the United States'. This, in effect, means that the account of the defendant, Culver Export Corporation and the account of its foreign subsidiaries are to be separately examined."

The report then considers separately the accounting made by the defendants, discusses the various items involved therein, lists those items concerning which there was no controversy and states the special master's reasons for disallowing other items. The accounts filed by the. defendants are restated by the special master in accordance with his rulings on the contested items contained therein.

Rule 61½ of the old Equity Rules, promulgated by the United States Supreme Court, 28 U.S.C.A. following section 723, provides that "the report of the master shall be treated as presumptively correct". Under Rule 1 of the Rules of Practice in copyright proceedings, effective July 1, 1909, 17 U.S.C.A. following section 25, "the existing rules of equity practice, so far as they may be applicable, shall be enforced in proceedings instituted under section twenty-five (25)" of the Copyright Act. The new Federal Rules of Civil Procedure do not apply because, under Rule 81 (a) (1) thereof, 28 U.S.C.A. following section 723c, they have not as yet been made applicable to proceedings in copyright by any rule promulgated by the Supreme Court of the United States. In Callaghan v. Myers, 128 U.S. 617, 9 S.Ct. 177, 32 L.Ed. 547, Mr. Justice Blatchford, in a case involving a copyright infringement, wrote [page 191]: "In considering the exceptions of the de-

fendants to the masters' reports in matters of fact, questioning the accuracy of their conclusions in respect to the amount of the defendants' profits, we have observed the rule recognized and affirmed in Tilghman v. Proctor, 125 U.S. 136, 149, 8 S.Ct. 894, [31 L.Ed. 664, 668], that, in dealing with such exceptions, 'The conclusions of the master, depending upon the weighing of conflicting testimony, have every reasonable presumption in their favor, and are not to be set aside or modified unless there clearly appears to have been error or mistake on his part.' "

It may be noted that the concluding statement in the above quotation is very similar to Rule 53 (e) (2) of the new Federal Rules of Civil Procedure, 28 U.S. C.A. following section 723c.

Before considering the exceptions filed by the parties to specific items of the account, I will discuss a general exception of the defendants, raising a fundamental issue, as to the nature and extent of the profits to be accounted for by the defendants.

Defendants contend that under Section 25 (b) of the Copyright Act they are required to pay complainants only the profits defendants realized from the infringement, which they interpret as meaning the profits realized from the use made of complainants' play as distinguished from profits attributable to other elements that made the motion picture a financial success. Defendants argue that the complainants should not receive all the net profits realized from the sale, leasing and exhibition of the picture, but only so much thereof as may justly be considered as the play's contribution thereto. In support of this contention defendants show that the picture, when released to exhibitors under a block booking arrangement, was listed only as "Production No. 208, Joan Crawford No. 2", and that the box-office drawing powers of the screen stars, Joan Crawford and Robert Montgomery actually produced the profits.

There was submitted to the special master an analysis "to show the limited nature and extent of the infringement as bearing on the quantum of the award to be made by the master". Evidence from experts and other sources was presented to establish that the "maximum average contribution of a play such as Dishonored Lady to the moving picture Letty Lynton could not possibly amount to more than 10% of the net domestic profits of the picture". Proof was offered through well-known producers of the royalties paid to authors whose works were used as the basis for motion pictures, such as "Peter Pan". For the motion-picture rights to that play and its title, Sir James Barrie received 7% of the gross receipts. The motion-picture rights of "Gone with the Wind" were sold for $50,000. In the present case complainants had entered into a contract for a sale of their play to one of the defendants for $30,000, subject to the approval of the Will Hays group of censors who refused to pass it. The net profits the master has awarded to complainants are $587,604.37, almost twenty times that price.

Complainants' play was based upon the celebrated murder trial of Madeleine Smith in Scotland in 1857. The defendants, instead of buying the motion picture rights to the play, after it was barred by the censors, purchased for $3,500 the rights to a novel, "Letty Lynton", written about the same time by Mrs. Belloc Lowndes and based on the same theme.

On the trial of the infringement issue in this case the complaint was dismissed because the trial court held in effect that the defendants had used only those general themes, motives, or ideas in which there could be no copyright, matters in the public demesne. The Circuit Court of Appeals in its opinion states (81 F.2d 49) at page 54: "In the case at bar there are then two questions: First, whether the defendants actually used the play; second, if so, whether theirs was a 'fair use.' The judge did not make any finding upon the first question, as we said at the outset, because he thought the defendants were in any case justified; in this following our decision in Nichols v. Universal Pictures Corporation [2 Cir.] 45 F.(2d) 119."

The Circuit Court of Appeals found that the defendants did use a substantial part of plaintiffs' play and that it was not a fair use, and stated (page 56): "True, much of the picture owes nothing to the play; some of it is plainly drawn from the novel; but that is entirely immaterial; it is enough that substantial parts were lifted; no plagiarist can excuse the wrong by showing how much of his work he did not pirate. We cannot avoid the conviction that, if the picture was not an infringement of the play, there can be none short of taking the dialogue."

■ There can be no apportionment of the profits of the infringing composition based upon a comparison of what was plagiarized with what was not. As was stated by Mr. Justice Blatchford in Callaghan v. Myers, 128 U.S. 617, at page 666, 9 S.Ct. 177, at page 191, 32 L.Ed. 547: "If the volume contains matter to which a copyright could not properly extend, incorporated with matter proper to be covered by a copyright, the two necessarily going together when the volume is sold, as a unit, and it being impossible to separate the profits on the one from the profits on the other, and the lawful matter being useless without the unlawful, it is the defendants who are responsible for having blended the lawful with the unlawful, and they must abide the consequences, on the same principle that he who has wrongfully produced a confusion of goods must alone suffer."

■ Further, in an accounting of the infringers' profits "the value which the plaintiff put upon its rights in uncompleted negotiations with the defendants will be wholly immaterial". L. C. Page & Co. v. Fox Film Corporation, 2 Cir., 83 F.2d 196, 200.

■ The pertinent provisions of Section 25 of the Copyright Act are printed in a footnote.[1] The parts thereof enclosed within brackets were added to this section in 1912. Under the decisions of the Supreme Court and of the Circuit Court of Appeals in this circuit, as hereinafter discussed, the trial court may not award statutory damages "in lieu of actual damages and profits" where there is satisfactory proof of the copyright owner's actual damages or of the infringer's actual profits.

Defendants argue in effect that "an award of all the profits resulting from an infringement," although the only money relief on which complainants submitted any proof (there was no proof of complainants' damages) "may be so disproportionate to the injury to complainant and so excessive in amount as to be inequitable and unjust". See dissenting opinion of Judge McCormick in Harold Lloyd Corporation v. Witwer, 9 Cir., 65 F.2d 1, 45. The majority opinion in the Harold Lloyd Case did not disagree with this proposition as indicated by the following quotation [page 18]: "We are assuming * * * that the copyright owner is entitled to all the profits derived from the infringing play. We do not wish to be understood as approving that doctrine which is one of the main issues in the case at bar, if infringement is found."

Much of Judge McCormick's opinion in the Harold Lloyd Case is based upon his interpretation of the words "in lieu there-

---

[1] "§ 25. *Infringement.* If any person shall infringe the copyright in any work protected under the copyright laws of the United States such person shall be liable:
* * * * * *
"(b) *Damages and profits; amount; other remedies.* (b) To pay to the copyright proprietor such damages as the copyright proprietor may have suffered due to the infringement, as well as all the profits which the infringer shall have made from such infringement, and in proving profits the plaintiff shall be required to prove sales only and the defendant shall be required to prove every element of cost which he claims, or in lieu of actual damages and profits such damages as to the court shall appear to be just, and in assessing such damages the court may, in its discretion, allow the amounts as hereinafter stated, but in case of a newspaper reproduction of a copyrighted photograph such damages shall not exceed the sum of $200 nor be less than the sum of $50, [and in the case of the infringement of an undramatized or nondramatic work by means of motion pictures, where the infringer shall show that he was not aware that he was infringing, and that such infringement could not have been reasonably foreseen, such damages shall not exceed the sum of $100; and in the case of an infringement of a copyrighted dramatic or dramatico-musical work by a maker of motion pictures and his agencies for distribution thereof to exhibitors, where such infringer shows that he was not aware that he was infringing a copyrighted work, and that such infringements could not reasonably have been foreseen, the entire sum of such damages recoverable by the copyright proprietor from such infringing maker and his agencies for the distribution to exhibitors of such infringing motion picture shall not exceed the sum of $5,000 nor be less than $250,] and such damages shall in no other case exceed the sum of $5,000 nor be less than the sum of $250, and shall not be regarded as a penalty. [But the foregoing exceptions shall not deprive the copyright proprietor of any other remedy given him under this law, nor shall the limitation as to the amount of recovery apply to infringements occurring after the actual notice to a defendant, either by service of process in a suit or other written notice served upon him.]"

of" in Section 25 of the Copyright Act, as indicating that Congress intended "to enable the court to meet the exigencies of each case by the exercise of sound judicial discretion in awarding pecuniary redress to the copyright proprietor in addition to injunctive relief".

The Harold Lloyd Case was decided by the Ninth Circuit in 1933. In 1935 the Supreme Court of the United States had before it the case of Douglas v. Cunningham, 294 U.S. 207, 55 S.Ct. 365, 79 L.Ed. 862.

■ I am of the opinion that the only cases in which the "in lieu thereof" provision applies are those "where the rules of law render difficult or impossible proof of damages or discovery of profits", as was stated by Mr. Justice Roberts in the Douglas Case, supra, 55 S.Ct. 366.

■ In the case at bar there has been discovery of the profits made by defendants from the picture, so there appears to be no discretion resting with the trial court, on the present state of the law, to substitute its own views of what should be the amount of plaintiffs' judgment in lieu of the actual net profits made by the defendants.

The Court of Appeals in the Second Circuit in the case of Davilla v. Brunswick-Balke Collender Co., 94 F.2d 567, cites the case of Douglas v. Cunningham, supra, and states "Whether profits shall be awarded or statutory damages allowed is not a matter of choice with a plaintiff". [Page 568.] Nor did the appellate court leave it as a matter of choice with the trial court. The decree of the lower court awarding statutory damages of $5,000 was modified because the appellate court held that the proof before the special master was sufficient to establish the infringers' profits at $1,057.53.

In the case of Dam v. Kirk La Shelle Co., 2 Cir., 175 F. 902, 903, at page 908, 41 L.R.A.,N.S., 1002, 20 Ann.Cas. 1173, Judge Noyes, writing for the Circuit Court of Appeals in this Circuit in 1910, stated: "It is equally impossible for him to show the proportion of the profits accruing to a theatrical company from the use of a copyrighted theme or plot and the proportion accruing from the use of the scenery, the employment of favorite actors, and other sources."

■ I am bound by that decision, even though I believe it runs counter to the course later followed by that Court in ap-

portioning profits in patent infringement cases and to the arguments therein expressed. Further Judge Noyes wrote the above quoted sentence in a copyright case some years prior to Judge Van Devanter's opinion in the Dowagiac (patent) Case, infra, in which, while admitting the impossibility of mathematical exactness, the justice expressed his satisfaction with such reasonable approximation as could be obtained through the testimony of experts and informed persons.

■ In the present case defendants asked the special master to make the apportionment declared impossible in the case of Dam v. Kirk La Shelle Co., supra. This phase of the evidence and these contentions of the defendants for an apportionment of the profits are not mentioned in the special master's report. He probably took the testimony on this point so that it could be made part of the record herein, for such consideration as an appellate court might deem warranted by the facts of this case. The interlocutory decree naming the special master provided: "that the complainants recover of the defendants and each of them all gains and profits made by the defendants and each of them because of the said infringement", and he determined that the profits from the picture were the profits from the infringement and awarded all those profits to the plaintiff. The only damages recoverable under the final decree in a suit for copyright infringement are such as the interlocutory decree adjudged. Russell & Stoll Co. v. Oceanic Elec. Supply Co., 2 Cir., 80 F.2d 864.

Defendants urge that this court should apply to the case of copyright infringement the principle of apportioning profits based on a royalty to be fixed by the Court, as is frequently done in patent cases where a machine in one of its parts infringes a patent relating to that part only. It was manifestly unjust to award all the profits from the sale of the machine to the owner of a patent that was infringed by only a part of the machine. Because of the unjust results under the provisions of the Patent Law, prior to their amendment (see 35 U. S.C.A. § 70), the Courts applied a rule of their own as expressed in Dowagiac Mfg. Co. v. Minnesota Moline Plow Co., 1915, 235 U.S. 641, 646, 35 S.Ct. 221, 223, 59 L. Ed. 398: "In so far as the profits from the infringing sales were attributable to the patented improvements they belonged to the plaintiff, and in so far as they were

due to other parts or features they belonged to the defendants. But as the drills were sold in completed and operative form, the profits resulting from the several parts were necessarily commingled. It was essential, therefore, that they be separated or apportioned between what was covered by the patent and what was not covered by it; for, as was said in Westinghouse Electric & Mfg. Co. v. Wagner Electric & Mfg. Co. supra ([225 U.S. 604] page 615 [32 S.Ct. 691, 56 L.Ed. 1222, 41 L.R.A.,N.S., 653]): 'In such case, if plaintiff's patent only created a part of the profits, he is only entitled to recover that part of the net gains.' In the nature of things the profits pertaining to the patented improvements had to be ascertained before they could be recovered by the plaintiff, and therefore it was required to take the initiative in presenting evidence looking to an apportionment. Referring to a like situation, it was said in the case just cited (page 617 [32 S.Ct. 691]): 'The burden of apportionment was then logically with the plaintiff, since it was only entitled to recover such part of the commingled profits as was attributable to the use of its invention.' But the plaintiff did not conform to this rule. It neither submitted evidence calculated to effect an apportionment, nor attempted to show that one was impossible; and this, although the evidence upon the accounting went far towards showing that there was no real obstacle to a fair apportionment. Certainly no obstacle was interposed by the defendants. It well may be that mathematical exactness was not possible, but, as is shown in Westinghouse Electric & Mfg. Co. v. Wagner Electric & Mfg. Co. supra (pages 617, 620-622 [32 S.Ct. 691]), that degree of accuracy is not required, but only reasonable approximation, which usually may be attained through the testimony of experts and persons informed by observation and experience. Testimony of this character is generally helpful and at times indispensable in the solution of such problems. Of course, the result to be accomplished is a rational separation of the net profits so that neither party may have what rightfully belongs to the other, and it is important that the accounting be so conducted as to secure this result, if it be reasonably possible."

See, also, opinions by Judge Learned Hand in Page Machine Co. v. Dow, Jones & Co., D.C., 1916, 238 F. 369, and Cincinnati Car Co. v. New York Rapid Transit Corp., 2 Cir., 66 F.2d 592.

In my opinion it is punitive and unjust to award all the net profits of the motion picture "Letty Lynton" to the complainants in this case. Yet under the wording of the Copyright Act (§ 25) as interpreted by the decisions of the appellate courts, I can do nothing less. The rule for apportioning profits, followed in patent infringement cases, should not be difficult of application to copyright infringement cases. The courts overcame the difficulty in patent cases by awarding something in the nature of a royalty, that would represent "a point or sum where it is demonstrable that to go beyond that point or exceed that sum is to set over to plaintiff profits to which the infringing elements make no contribution". Standard Scale & Supply Co. v. Cropp Concrete Mach. Co., 7 Cir., 6 F.2d 447, 454, 455.

If complainants get all the profits of the picture they are receiving the profits that Joan Crawford and Robert Montgomery made for the picture by their dramatic talent and the drawing power of their reputations as motion picture stars. The directors who supervised the production of the picture and the experts who filmed it also contributed in piling up these tremendous net profits. Complainants' counsel refers to defendants' contribution to the success of the picture as "labor and material". Deducting the salaries of these personages from the gross receipts merely reimburses the defendants for their actual costs and expenses, but gives to the complainants all of the profits the defendants' stars and directors and filming experts made for the picture. The testimony of experts should be received on the question of how much the use of complainants' play contributed to the profits of the picture, just as similar expert testimony is now received in patent infringement cases under Section 70 of the Patent Law, 35 U.S.C.A., from which the following is quoted:

"If on the proofs it shall appear that the complainant has suffered damage from the infringement or that the defendant has realized profits therefrom to which the complainant is justly entitled, but that such damages or profits are not susceptible of calculation and determination with reasonable certainty, the court may, on evidence tending to establish the same, in its discretion, receive opinion or expert testimony, which is hereby declared to be competent and admissible, subject to the general rules of evidence applicable to this character of testimony; and upon such evidence and all

other evidence in the record the court may adjudge and decree the payment by the defendant to the complainant of a reasonable sum as profits or general damages for the infringement."

The above paragraph was added to Section 70 in 1922 sometime after the Supreme Court in the Dowagiac Case suggested the use of experts, in the opinion hereinabove quoted.

An allowance to complainants of 25% of the net profits, as restated, or about $133,000 would be such a sum as could be justly fixed as a limit beyond which complainants would be receiving profits in no way attributable to the use of their play in the production of the picture. Sir James Barrie received 7% of the gross receipts from the motion picture based on "Peter Pan". For that he assigned the motion picture rights to his famous play and the right to use the name as the title of the picture. The gross receipts in the case at bar from the picture "Letty Lynton" were $1,655,269.15, of which 8% would be about $132,500. In my opinion the testimony before the special master would justify a finding in this case that the profits these defendants made from their use of complainants' play "Dishonored Lady" did not exceed 25% of the net profits from the picture; as hereinafter fixed, or, if a royalty basis should be used, 8% of the gross receipts. It requires no expert testimony to show that the use of complainants' play "Dishonored Lady" did not contribute the entire 100% of the net profits realized from the picture "Letty Lynton". Yet that is what this judgment gives the complainants.

If we are "to avoid instances of grotesque injustice" then "we must adopt some working rule" similar to that employed in patent infringement cases. Page Machine Co. v. Dow, Jones & Co., supra. A result such as we have in the present case may lead to the adoption of such a rule, either through the decision of an appellate court, giving a more reasonable interpretation of Section 25 of the Copyright Act, or by Congress amending the Act. Jewell-La Salle Realty Co. v. Buck, 283 U. S. 202, 208, 51 S.Ct. 407, 75 L.Ed. 978.

At the hearings before the special master defendants claimed that "they should be allowed to deduct from any amount found * * * due the complainants as profits from 'Letty Lynton' an amount which they claimed would be the equivalent of Federal income taxes at the rate of 14½% of such profits." The special master reported that there was not sufficient evidence before him from which he could find that the profits from the picture were "taxable profits" on which the defendants had actually paid a tax. He reported that if this issue had been satisfactorily met he would "have no difficulty in allowing the defendants * * * to deduct * * * the proper amount of income taxes". In support of his conclusion of law that the defendants were entitled to deduct the corporate income tax they paid on the "Letty Lynton" profits he cites the case of Stromberg Motor Devices Co. v. Zenith-Detroit Corp., 2 Cir., 73 F.2d 62. I think the following quotation from that case is in point and cites all the leading cases on the question (page 65):

"Finally, the defendant insists that it should be allowed a deduction for federal income taxes paid and attributable to the profits derived from the infringing carburetors. Such taxes reduce the profits in a very real sense. But for them the profits the defendant would have retained would have been so much the greater. Whether in its accounting with the plaintiff it may be entitled to the deduction depends upon whether it willfully was infringing the Mock patent or not. Larson Co. v. Wrigley Co., 277 U.S. 97, 48 S.Ct. 449, 72 L. Ed. 800. It did deliberately test this patent. It claimed it to be invalid and denied infringement. The issues raised were not without merit, as is made clear by the fact that it prevailed in the District Court and obtained a decree which we reversed on appeal. There was certainly a real controversy, and it would be a harsh rule which did not give the defendant the right to test the patent without being penalized on the accounting by what would be in effect punitive damages. We think the defendant's honest belief in its right to manufacture the infringing carburetors was sufficiently shown to entitle it to a deduction for income taxes paid which will leave it accountable to the plaintiff for only the profits of which it actually has had the benefit. Stromberg Motor Devices Co. v. Detroit Trust Co. [7 Cir., 44 F.2d 958] supra; Macbeth-Evans Glass Co. v. L. E. Smith Glass Co. (C.C.A.) 23 F.(2d) 459. See, also, Straus v. Notaseme Hosiery Co., 240 U.S. 179, 36 S.Ct. 288, 60 L.Ed. 590."

In the present case the District Judge dismissed the bill and his ruling was reversed by the Circuit Court of Appeals.

The District Judge certainly believed that the issues raised by the defendants had merit. The Circuit Court of Appeals in its opinion stated that in dismissing the complaint the District Judge was following the Circuit Court's decision in Nichols v. Universal Pictures Corp., supra. To refuse to permit the defendants to deduct the corporate income taxes they paid on the profits of "Letty Lynton" would be in effect the imposition of a penalty, superimposed on the judgment for profits herein.

Because he felt that the then state of the proof in respect to the actual payment of these taxes was unsatisfactory the special master suggested that the court in its decree set aside in special escrow subject to the further order of the Court a sum equal to the 14½% corporate income tax on the net profits, subject to certain terms and conditions with which neither side to the controversy seemed satisfied, as their exceptions to that part of the report indicate. On the arguments before me on the various subdivisions of the report, it was agreed that it would be better to dispose of the income tax issue now than to leave it open for future consideration under the escrow plan. The accountants for both sides have conferred and after an examination of the defendants' income tax returns and the present status thereof, counsel have entered into a stipulation, dated November 14, 1938, in which the rate of the tax and the amount thereof in dollars as paid by the defendants on the taxable profits of "Letty Lynton" are set forth in detail. This stipulation was supplemented by a rider on December 21, 1938, which declared that the only issue pending before the tax authorities in respect to defendants' income tax returns for the relevant years is whether the government shall assess additional taxes, and that no claim for a refund of any part of the taxes covered by the stipulation has been made by any of the defendants. The statute of limitations would now bar any such claim for refund.

■ Complainants have raised a new point in opposition to the allowance of a deduction of the defendants' income taxes from the profits of "Letty Lynton". They assert that the defendants will be entitled to deduct as a loss the amount of any judgment herein in the year in which it is put in judgment or paid (Central Trust Co. v. Burnet, 60 App.D.C. 4, 45 F.2d 922; Lucas v. American Code Co., 280 U.S. 445, 50 S. Ct. 202, 74 L.Ed. 538, 67 A.L.R. 1010) and

that since corporation income tax rates are higher now than when defendants received the "Letty Lynton" profits the defendants will benefit thereby. If defendants are permitted on this accounting to deduct the corporate income taxes actually paid on the "Letty Lynton" profits the amount of the judgment herein will be so much less, and the amount defendants will be entitled to deduct later as a tax loss will be correspondingly less, and the amount on which the complainants will pay an income tax will also be less. In my opinion whatever tax advantage defendants may gain when they pay or settle complainants' judgment herein is irrelevant to the issue, just as is the effect the receipt by complainants of this large sum may have on complainants' tax situation.

■ As to the Culver Corporation's accounting, defendants contend that the Culver Corporation should not be charged with profits derived from the sale or leasing of the picture "Letty Lynton" outside the United States, that all of Culver's profits were made in foreign countries except $2,876.10 received from the renting of films to the United States Navy. It is argued that the Copyright Act has no extraterritorial operation, unless otherwise provided (American Code Co. v. Bensinger, 2 Cir., 282 F. 829, 833), and that therefore Culver should not be held to account except for the $2,876.10. This argument overlooks the fact that the Culver Corporation is a domestic corporation and is a mere instrumentality or agency of the Pictures Corporation; that it has a place of business at Culver City, California, and also in New York City; that the infringing negatives were made at Culver City, California, and foreign versions thereof were sent abroad by the Culver Corporation to its foreign subsidiaries through which positive prints were made and distributed abroad for rental fees. A large part of the revenue thus received was actually paid to Culver as percentages by its foreign subsidiaries. Culver accounts for all the profits made by its foreign subsidiaries because Culver owns the entire capital stock of all those agencies of Culver, except the Swedish corporation in which Culver owns a substantial interest. As to the Swedish corporation, Culver accounts only for the part of the profits Culver received. The Culver Export Corporation was properly held to account for the profits it thus made abroad from the infringement Culver perpetrated, in part, in this country.

144

Pursuant to Rule 66 of the old Equity Rules, 28 U.S.C.A. following section 723, exceptions were filed by both sides to the special master's ruling on numerous items contained in the account filed by defendants, showing their receipts from sales and leases of the picture "Letty Lynton" and the "elements of cost" claimed by them. After certain preliminary hearings before the Court on this motion, waivers of a number of the exceptions were filed so as to leave for determination only the basic objections and the larger items. I will now separately consider the account of each defendant as found and stated by the special master.

### Account of Defendant, Metro-Goldwyn Pictures Corporation:

All of complainants' exceptions that were not later waived are overruled and the rulings of the special master on the items involved are approved for the reasons stated in his report.

Defendant's exceptions, where not waived, are likewise overruled except as to the following:

An item of $610.76 (negative cost) should be included in the total of the negative cost of the picture and not as part of the General Studio Overhead, as calculated by the special master. An item of $3,630.12, dues payable to the Motion Pictures Producers and Distributors Association based on a percentage of the amount grossed by the picture: these "dues" were really for services rendered by the association to this producer as a member of the association. In my opinion the Association could properly refuse to refund the same. If the defendant did not pay, the Association would go unpaid so far as this picture is concerned. I believe it was a proper and customary charge and should have been allowed as an item of cost. The same is true of a similar item of $79.69.

Defendant's exception to the failure of the special master to allow a deduction of income taxes is sustained and from the account as restated by the special master there should also be deducted income taxes amounting to $16,445.48. The net profits to be accounted for by the Pictures Corporation after the above deductions will be $248,095.09.

### Account of Metro-Goldwyn-Mayer Distributing Corporation, Loew's, Inc., and Culver Export Corporation:

All exceptions (not waived) filed by either the complainants or the defendants to the report of the special master in relation to these accounts and the rulings of the special master on disputed items contained therein, are overruled except that these defendants shall be entitled respectively to a deduction of the sums they paid as corporate income taxes (as calculated by the parties in the stipulation herein dated November 14, 1938) from their net profits from the picture "Letty Lynton" as restated by the special master in his report. The amounts of these deductions or credits for income taxes paid are as follows:

Metro-Goldwyn-Mayer Distributing Corporation ..............$ 9,032.79
Loew's Inc. .......$11,269.80
Loew's Foreign
Subsidiaries ... 1,987.37....$13,257.17
Culver Export Corporation .....$12,394.88

After these deductions for income taxes the net profits for which these three corporations are accountable will be as follows:

Metro-Goldwyn-Mayer Distributing Corporation .......... $59,570.63
Loew's Inc. ................. $84,209.51
Culver Export Corporation ....$140,278.25

The question has been raised as to the liability of the several defendants for the profits made by their codefendants. Section 25 of the Copyright Act requires each infringer to account for the profits it received. The statute gives the complainant the right to recover those profits from that infringer, but no other infringer is jointly liable therefor. As to the damages sustained by a complainant through the infringement of his copyright, infringers who are joint tort feasors are jointly liable.

In International Radio Tel. Co. v. Atlantic C. Co., 2 Cir., 290 F. 698, a patent infringement case, Judge Hough held that [page 703] "there can be no recovery of profits from a defendant, except of profits that defendant made". This principle applies also to the copyright infringers in the case at bar.

However, I am of the opinion that the Distributing Corporation and Culver Corporation were only the agents, instrumentalities or sub-divisions of the Pictures Corporation and that the Pictures Corporation should therefore be held liable not only for its own profits, but for the profits of the Distributing Corporation and the Culver Corporation, in both of which the Pic-

tures Corporation owned the entire capital stock, controlling and using them as mere instrumentalities or adjuncts. Owl Fumigating Corp. **v.** California Cyanide Co., 3 Cir., 30 F.2d 812; Industrial Research Corp. **v.** General Motors Corp., D.C., 29 F.2d 623; United States v. Reading Co., 253 U.S. 26, 40 S.Ct. 425, 64 L.Ed. 760; Chicago, M. & St. P. R. Co. v. Minneapolis, C. & C. Ass'n, 247 U.S. 490, 38 S.Ct. 553, 62 L.Ed. 1229.

 Although Loew's owned all the common stock of the Pictures Corporation and 10% of its preferred stock, the business of Loew's embraced several fields of activity in which the Pictures Corporation is not engaged. Further, about 90% of the preferred stock of the Pictures Corporation is owned by the general public. The evidence does not show that the Pictures Corporation was a mere instrumentality or agent of Loew's or a department of Loew's business. Loew's was properly required to account for the profits of the hundred odd theatres, operated by corporations in which it owned all the stock.

 The Distributing Corporation owned no stock of Culver Corporation nor did Culver Corporation own any stock of Distributing Corporation. It is true that all of the capital stock of both the Distributing Corporation and the Culver Corporation is owned by the Pictures Corporation, but that would be no basis for charging profits of the Distributing Corporation against the Culver Corporation or vice versa.

Loew's, Inc., will not be held liable for the profits of the other defendants. The Pictures Corporation will not be held for the profits of Loew's. But the Pictures Corporation will be held severally liable for its own profits and also jointly liable with the Distributing Corporation and the Culver Corporation for their respective profits.

The findings of fact and conclusions of law made by the special master, except as herein modified or rejected, are hereby adopted by this Court, and the special master's report is approved, with the exceptions herein indicated.

Two applications for allowances have been made, one by the special master, who requests the sum of $20,000, the other by the attorneys for the successful complainants, who ask for $135,000.

 The special master groups his services as follows: (a) Hearings he held at his office before March 1, 1937, and his pre-liminary work on the issues involved in the action—38 hours. (b) His trip to Culver City, California, and the hearings he held there, all of which took sixteen days of his time. He left New York on February 25, 1937; the hearings at Culver City, California, began March 1, 1937 and ended March 8th; he left California on his return trip to New York on March 9th. (c) Hearings he held in his office after his return from California, twenty-two hearings totalling forty-four hours. (d) The time spent in preparing his report—241 hours.

Excluding the trip to California and the taking of testimony there, the special master, as set forth in subdivisions (a), (c) and (d), spent 323 hours on this reference. At the rate of $35.00 an hour (Newton v. Consolidated Gas Co., 259 U.S. 101, 42 S. Ct. 438, 66 L.Ed. 844) this would total $11,305. For his time and services in going to California and taking testimony there (subdivision b) I am of the opinion that he should be allowed $4,000, at the rate of $250 a day for the sixteen days that he was away from New York. His total allowance is fixed at $15,305, which the defendants are ordered to pay within thirty days after the entry of a final decree herein.

 The attorneys for the complainants divide their requested allowance into two parts—$100,000 for the services rendered in the District Court and $35,000 for the services rendered in the Circuit Court of Appeals.

I have concluded that a proper allowance for all their services in this matter from the time that they were first consulted by their clients down to and inclusive of the entry of a final decree herein would be the sum of $55,000, computed as follows: $10,000 for services rendered prior to the trial of the action; $5,000 for the trial, briefs and the argument; $10,000 (a) for services on the appeal to the Circuit Court of Appeals and for opposing in that Court two applications for a re-hearing and (b) for filing briefs in opposition to the defendants' application to the United States Supreme Court for a writ of certiorari; $22,500 for their services in the accounting proceeding before the special master; and $7,500 for their services in preparing exceptions to the special master's report, in preparing briefs on this motion, for attendance and argument at hearings on the exceptions and for the entry of a final decree herein. This allowance is,

146

in my opinion, a reasonable attorney's fee (United States v. Equitable Trust Co., 283 U.S. 738, 51 S.Ct. 639, 75 L.Ed. 1379), to be allowed the complainants for the services of their attorneys, pursuant to the provisions of the Copyright Act, 17 U.S.C.A. § 40, and as directed by the Circuit Court of Appeals in its mandate herein. Sheldon v. Metro-Goldwyn Pictures Corporation, 2 Cir., 81 F.2d 49, 56.

"In determining what is a reasonable fee for an attorney, the elements to be considered, among others, are the amount involved, for that measures the attorneys' responsibility; the amount of work necessary; the amount of work done; the skill used, and the result". Lewys v. O'Neill, D.C., 49 F.2d 603, 618. See, also, Davilla v. Brunswick-Balke Collender Co., 2 Cir., 94 F.2d 567.

The allowance of $55,000 to the complainants as a reasonable fee for their attorneys shall be included, as part of the costs hereby allowed the complainants in the final decree to be entered herein.

Submit decree in accordance with this opinion on two days' notice.