# SHELDON ET AL. *v.* METRO-GOLDWYN PICTURES CORP. ET AL.

No. 482. Argued February 8, 9, 1940.—Decided March 25, 1940.

*Mr. Arthur F. Driscoll,* with whom *Mr. Edward J. Clarke* was on the brief, for petitioners.

392

*Mr. John W. Davis,* with whom *Messrs. J. Robert Rubin, Samuel D. Cohen,* and *Earle L. Beatty* were on the brief, for respondents.

MR. CHIEF JUSTICE HUGHES delivered the opinion of the Court.

The questions presented are whether, in computing an award of profits against an infringer of a copyright, there may be an apportionment so as to give to the owner of the copyright only that part of the profits found to be attributable to the use of the copyrighted material as distinguished from what the infringer himself has supplied, and, if so, whether the evidence affords a proper basis for the apportionment decreed in this case.

Petitioners' complaint charged infringement of their play "Dishonored Lady" by respondents' motion picture "Letty Lynton," and sought an injunction and an accounting of profits. The Circuit Court of Appeals, reversing the District Court, found and enjoined the infringement and directed an accounting. 81 F. 2d 49. Thereupon the District Court confirmed with slight modifications the report of a special master which awarded to petitioners all the net profits made by respondents from their exhibitions of the motion picture, amounting to $587,604.37. 26 F. Supp. 134, 136. The Circuit Court of Appeals reversed, holding that there should be an apportionment and fixing petitioners' share of the net profits at one-fifth. 106 F. 2d 45, 51. In view of the importance of the question, which appears

to be one of first impression in the application of the copyright law, we granted certiorari.   December 4, 1939.

Petitioners' play "Dishonored Lady" was based upon the trial in Scotland, in 1857, of Madeleine Smith for the murder of her lover,—a *cause célèbre* included in the series of "Notable British Trials" which was published in 1927.   The play was copyrighted as an unpublished work in 1930, and was produced here and abroad. Respondents took the title of their motion picture "Letty Lynton" from a novel of that name written by an English author, Mrs. Belloc Lowndes, and published in 1930. That novel was also based upon the story of Madeleine Smith and the motion picture rights were bought by respondents.   There had been negotiations for the motion picture rights in petitioners' play, and the price had been fixed at $30,000, but these negotiations fell through.

As the Court of Appeals found, respondents in producing the motion picture in question worked over old material; "the general skeleton was already in the public demense.   A wanton girl kills her lover to free herself for a better match; she is brought to trial for the murder and escapes."   But not content with the mere use of that basic plot, respondents resorted to petitioners' copyrighted play.   They were not innocent offenders.   From comparison and analysis, the Court of Appeals concluded that they had "deliberately lifted the play"; their "borrowing was a deliberate plagiarism."   It is from that standpoint that we approach the questions now raised.

Respondents contend that the material taken by infringement contributed in but a small measure to the production and success of the motion picture.   They say that they themselves contributed the main factors in producing the large net profits; that is, the popular actors, the scen-

ery, and the expert producers and directors. Both courts below have sustained this contention.

The District Court thought it "punitive and unjust" to award all the net profits to petitioners. The court said that, if that were done, petitioners would receive the profits that the "motion picture stars" had made for the picture "by their dramatic talent and the drawing power of their reputations." "The directors who supervised the production of the picture and the experts who filmed it also contributed in piling up these tremendous net profits." The court thought an allowance to petitioners of 25 per cent. of these profits "could be justly fixed as a limit beyond which complainants would be receiving profits in no way attributable to the use of their play in the production of the picture." But, though holding these views, the District Court awarded all the net profits to petitioners, feeling bound by the decision of the Court of Appeals in *Dam* v. *Kirk La Shelle Co.*, 175 F. 902, 903, a decision which the Court of Appeals has now overruled.

The Court of Appeals was satisfied that but a small part of the net profits was attributable to the infringement, and, fully recognizing the difficulty in finding a satisfactory standard, the court decided that there should be an apportionment and that it could fairly be made. The court was resolved "to avoid the one certainly unjust course of giving the plaintiffs everything, because the defendants cannot with certainty compute their own share." The court would not deny "the one fact that stands undoubted," and, making the best estimate it could, it fixed petitioners' share at one-fifth of the net profits, considering that to be a figure "which will favor the plaintiffs in every reasonable chance of error."

*First*. Petitioners insist fundamentally that there can be no apportionment of profits in a suit for a copyright infringement; that it is forbidden both by the statute and the decisions of this Court. We find this basic argument to be untenable.

The Copyright Act in § 25 (b)[1] provides that an infringer shall be liable—

"(b) To pay to the copyright proprietor such damages as the copyright proprietor may have suffered due to the infringement, as well as all the profits which the infringer shall have made from such infringement, . . . or in lieu of actual damages and profits, such damages as to the court shall appear to be just, . . ."

We agree with petitioners that the "in lieu" clause is not applicable here, as the profits have been proved and the only question is as to their apportionment.

Petitioners stress the provision for recovery of "all" the profits, but this is plainly qualified by the words "which the infringer shall have made from such infringement." This provision in purpose is cognate to that for the recovery of "such damages as the copyright proprietor may have suffered due to the infringement." The purpose is thus to provide just compensation for the wrong, not to impose a penalty by giving to the copyright proprietor profits which are not attributable to the infringement.

Prior to the Copyright Act of 1909, there had been no statutory provision for the recovery of profits, but that recovery had been allowed in equity both in copyright and patent cases as appropriate equitable relief incident to a decree for an injunction. *Stevens* v. *Gladding,* 17 How. 447, 455. That relief had been given in accordance with the principles governing equity jurisdiction, not to inflict punishment but to prevent an unjust enrichment by allowing injured complainants to claim "that which, *ex aequo et bono,* is theirs, and nothing beyond this." *Livingston* v. *Woodworth,* 15 How. 546, 560. See *Root* v. *Railway Co.,* 105 U. S. 189, 194, 195. Statutory provision for the recovery of profits in patent cases was en-

[1] Act of March 4, 1909, § 25, 35 Stat. 1081, as amended by Act of August 24, 1912, 37 Stat. 489. 17 U. S. C., § 25 (b).

acted in 1870.[2] The principle which was applied both prior to this statute and later was thus stated in the leading case of Tilghman v. Proctor, 125 U. S. 136, 146:

"The infringer is liable for actual, not for possible gains. The profits, therefore, which he must account for, are not those which he might reasonably have made, but those which he did make, by the use of the plaintiff's invention; or, in other words, the fruits of the advantage which he derived from the use of that invention, over what he would have had in using other means then open to the public and adequate to enable him to obtain an equally beneficial result. If there was no such advantage in his use of the plaintiff's invention, there can be no decree for profits, and the plaintiff's only remedy is by an action at law for damages."

In passing the Copyright Act, the apparent intention of Congress was to assimilate the remedy with respect to the recovery of profits to that already recognized in patent cases. Not only is there no suggestion that Congress intended that the award of profits should be governed by a different principle in copyright cases but the contrary is clearly indicated by the committee reports on the bill. As to § 25 (b) the House Committee said:[3]

"Section 25 deals with the matter of civil remedies for infringement of a copyright. . . . The provision that the copyright proprietor may have such damages as well as the profits which the infringer shall have made is substantially the same provision found in section 4921 of the Revised Statutes relating to remedies for the infringement of patents. The courts have usually construed that to mean that the owner of the patent might have one or the other, whichever was the greater. As such a provision was found both in the trade-mark and patent

---

[2] Act of July 8, 1870, § 55, 16 Stat. 198, 206; R. S. 4921.

[3] House Report No. 2222, 60th Cong., 2d sess., p. 15. See, also, Senate Report No. 1108, 60th Cong., 2d sess., p. 15.

laws, the committee felt that it might be properly included in the copyright laws."

We shall presently consider the doctrine which has been established upon equitable principles with respect to the apportionment of profits in cases of patent infringement. We now observe that there is nothing in the Copyright Act which precludes the application of a similar doctrine based upon the same equitable principles in cases of copyright infringement.

Nor do the decisions of this Court preclude that course. Petitioners invoke the cases of *Callaghan* v. *Myers,* 128 U. S. 617, and *Belford* v. *Scribner,* 144 U. S. 488. In the *Callaghan* case, the copyright of a reporter of judicial decisions was sustained with respect to the portions of the books of which he was the author, although he had no exclusive right in the judicial opinions. On an accounting for the profits made by an infringer, the Court allowed the deduction from the selling price of the actual and legitimate manufacturing cost. With reference to the published matter to which the copyright did not extend, the Court found it impossible to separate the profits on that from the profits on the other. And in view of that impossibility, the defendant, being responsible for the blending of the lawful with the unlawful, had to abide the consequences, as in the case of one who has wrongfully produced a confusion of goods. A similar impossibility was encountered in *Belford* v. *Scribner,* a case of a copyright of a book containing recipes for the household. The infringing books were largely compilations of these recipes, "the matter and language" being "the same as the complainant's in every substantial sense," but so distributed through the defendants' books that it was "almost impossible to separate the one from the other." The Court ruled that when the copyrighted portions are so intermingled with the rest of the piratical work "that they cannot well be distinguished from it,"

the entire profits realized by the defendants will be given to the plaintiff.

We agree with the court below that these cases do not decide that no apportionment of profits can be had where it is clear that all the profits are not due to the use of the copyrighted material, and the evidence is sufficient to provide a fair basis of division so as to give to the copyright proprietor all the profits that can be deemed to have resulted from the use of what belonged to him. Both the Copyright Act and our decisions leave the matter to the appropriate exercise of the equity jurisdiction upon an accounting to determine the profits "which the infringer shall have made from such infringement."

*Second.* The analogy found in cases of patent infringement is persuasive. There are many cases in which the plaintiff's patent covers only a part of a machine and creates only a part of the profits. The patented invention may have been used in combination with additions or valuable improvements made by the infringer and each may have contributed to the profits. In *Elizabeth* v. *Pavement Co.*, 97 U. S. 126, 142, cited in the *Callaghan* and *Belford* cases, *supra*, it had been recognized that if a separation of distinct profit derived from such additions or improvements was shown, an apportionment might be had. See *Garretson* v. *Clark*, 111 U. S. 120, 121. The subject was elaborately discussed in the case of *Westinghouse Co.* v. *Wagner Co.*, 225 U. S. 604, where it was distinctly ruled that "if plaintiff's patent only created a part of the profits, he is only entitled to recover that part of the net gains." There, the Court was concerned with the question of burden of proof. It was said that the plaintiff suing for profits was under the burden of showing that they had been made. The defendant had submitted evidence tending to show that it had added non-infringing and valuable

improvements which had contributed to the making of profits; and the plaintiff in reply had insisted that these additions had made no such contribution. But assuming, as had been found, that the additions were non-infringing and valuable improvements, and a *prima facie* case of contribution to profits thus appearing, the burden of apportionment would rest upon the plaintiff. But in that relation it had still to be considered that the act of the defendant had made it "not merely difficult but impossible to carry the burden of apportionment" and in such case, as the "inseparable profit must be given to the patentee or infringer," the law placed the loss on the wrongdoer.

The question of burden of proof does not arise in the instant case, as here the defendants voluntarily assumed that burden and the court below has held that it has been sustained. What is apposite, however, is the ruling in the *Westinghouse* case as to apportionment and the sort of evidence admissible upon that question. The Court pointed to the difficulties of working out an account of profits and thought that the problem was analogous to that presented where it is necessary to separate inter-state from intrastate earnings and expenses in order to determine whether an intrastate rate is confiscatory. The Court observed that "while recognizing the impossibility of reaching a conclusion that is mathematically exact," there has been received, in addition to other relevant evidence, "the testimony of experts as to the relative cost of doing a local and through business." *Chicago, M. & St. P. Ry. Co.* v. *Tompkins*, 176 U. S. 167, 178. The Court thought that "What is permissible in an effort to separate costs may also be done in a patent case where it is necessary to separate profits."

The principle as to apportionment of profits was clearly stated in the case of *Dowagiac Co.* v. *Minnesota Co.*, 235

404

U. S. 641,—a case which received great consideration. The Court there said:

"We think the evidence, although showing that the invention was meritorious and materially contributed to the value of the infringing drills as marketable machines, made it clear that their value was not entirely attributable to the invention, but was due in a substantial degree to the unpatented parts or features. The masters and the courts below so found and we should hesitate to disturb their concurring conclusions upon this question of fact, even had the evidence been less clear than it was.

"In so far as the profits from the infringing sales were attributable to the patented improvements they belonged to the plaintiff, and in so far as they were due to other parts or features they belonged to the defendants. But as the drills were sold in completed and operative form the profits resulting from the several parts were necessarily commingled. It was essential therefore that they be separated or apportioned between what was covered by the patent and what was not covered by it, for, as was said in *Westinghouse Co.* v. *Wagner Co., supra* (225 U. S. 615): 'In such case, if plaintiff's patent only created a part of the profits, he is only entitled to recover that part of the net gains.'" *Id.*, 646.

In the *Dowagiac* case, we again referred to the difficulty of making an exact apportionment and again observed that mathematical exactness was not possible. What was required was only "reasonable approximation" which usually may be attained "through the testimony of experts and persons informed by observation and experience." Testimony of this character was said to be "generally helpful and at times indispensable in the solution of such problems." The result to be accomplished "is a rational separation of the net profits so that neither party may have what rightfully belongs to the other." *Id.*, p. 647

We see no reason why these principles should not be applied in copyright cases. Petitioners cite our decision in the trade-mark case of *Hamilton-Brown Shoe Co.* v. *Wolf Bros. Co.*, 240 U. S. 251, but the Court there, recognizing the rulings in the *Westinghouse* and *Dowagiac* cases, found on the facts that an apportionment of profits was "inherently impossible." The burden cast upon the defendant had not been sustained.

In 1922, some years after the *Dowagiac* decision, and in harmony with it, Congress amended § 70 of the patent law [4] so as to provide expressly that if "damages or profits are not susceptible of calculation and determination with reasonable certainty, the court may, on evidence tending to establish the same, in its discretion, receive opinion or expert testimony, which is hereby declared to be competent and admissible, subject to the general rules of evidence applicable to this character of testimony." The amendment, so far as it relates to the reception of expert testimony, recognized and cannot be deemed to enlarge the rules already applied in courts of equity, and the fact that the copyright law was not similarly amended cannot be considered to detract from the jurisdiction of the court to receive similar evidence in copyright cases whenever it is found to be competent.

Petitioners stress the point that respondents have been found guilty of deliberate plagiarism, but we perceive no ground for saying that in awarding profits to the copyright proprietor as a means of compensation, the court may make an award of profits which have been shown not to be due to the infringement. That would be not to do equity but to inflict an unauthorized penalty. To call the infringer a trustee *ex maleficio* merely indicates "a mode of approach and an imperfect analogy by which the wrongdoer will be made to hand over the

[4] Act of February 18, 1922, § 8, 42 Stat. 392, amending R. S. 4921. 35 U. S. C. 70.

proceeds of his wrong." *Larson Co.* v. *Wrigley Co.*, 277 U. S. 97, 99, 100. He is in the position of one who has confused his own gains with those which belong to another. *Westinghouse Co.* v. *Wagner Co.*, *supra*, p. 618. He "must yield the gains begotten of his wrong." *Duplate Corp.* v. *Triplex Co.*, 298 U. S. 448, 457. Where there is a commingling of gains, he must abide the consequences, unless he can make a separation of the profits so as to assure to the injured party all that justly belongs to him. When such an apportionment has been fairly made, the copyright proprietor receives all the profits which have been gained through the use of the infringing material and that is all that the statute authorizes and equity sanctions.

Both courts below have held in this case that but a small part of the profits were due to the infringement, and, accepting that fact and the principle that an apportionment may be had if the evidence justifies it, we pass to the consideration of the basis of the actual apportionment which has been allowed.

*Third.* The controlling fact in the determination of the apportionment was that the profits had been derived, not from the mere performance of a copyrighted play, but from the exhibition of a motion picture which had its distinctive profit-making features, apart from the use of any infringing material, by reason of the expert and creative operations involved in its production and direction. In that aspect the case has a certain resemblance to that of a patent infringement, where the infringer has created profits by the addition of non-infringing and valuable improvements. And, in this instance, it plainly appeared that what respondents had contributed accounted for by far the larger part of their gains.

Respondents had stressed the fact that, although the negotiations had not ripened into a purchase, the price which had been set for the motion picture rights in "Dis-

honored Lady" had been but $30,000. And respondents' witnesses cited numerous instances where the value, according to sales, of motion picture rights had been put at relatively small sums. But the court below rejected as a criterion the price put upon the motion picture rights, as a bargain had not been concluded and the inferences were too doubtful. The court also ruled that respondents could not count the effect of "their standing and reputation in the industry." The court permitted respondents to be credited "only with such factors as they bought and paid for; the actors, the scenery, the producers, the directors and the general overhead."

The testimony showed quite clearly that in the creation of profits from the exhibition of a motion picture, the talent and popularity of the "motion picture stars" generally constitutes the main drawing power of the picture, and that this is especially true where the title of the picture is not identified with any well-known play or novel. Here, it appeared that the picture did not bear the title of the copyrighted play and that it was not presented or advertised as having any connection whatever with the play. It was also shown that the picture had been "sold," that is, licensed to almost all the exhibitors as identified simply with the name of a popular motion picture actress before even the title "Letty Lynton" was used. In addition to the drawing power of the "motion picture stars," other factors in creating the profits were found in the artistic conceptions and in the expert supervision and direction of the various processes which made possible the composite result with its attractiveness to the public.

Upon these various considerations, with elaboration of detail, respondents' expert witnesses gave their views as to the extent to which the use of the copyrighted material had contributed to the profits in question. The underlying facts as to the factors in successful production and ex-

hibition of motion pictures were abundantly proved, but, as the court below recognized, the ultimate estimates of the expert witnesses were only the expression "of their very decided opinions." These witnesses were in complete agreement that the portion of the profits attributable to the use of the copyrighted play in the circumstances here disclosed was very small. Their estimates given in percentages of receipts ran from five to twelve per cent; the estimate apparently most favored was ten per cent as the limit. One finally expressed the view that the play contributed nothing. There was no rebuttal. But the court below was not willing to accept the experts' testimony "at its face value." The court felt that it must make an award "which by no possibility shall be too small." Desiring to give petitioners the benefit of every doubt, the court allowed for the contribution of the play twenty per cent. of the net profits.

Petitioners are not in a position to complain that the amount thus allowed by the court was greater than the expert evidence warranted. Nor is there any basis for attack, and we do not understand that any attack is made, upon the qualifications of the experts. By virtue of an extensive experience, they had an intimate knowledge of all pertinent facts relating to the production and exhibition of motion pictures. Nor can we say that the testimony afforded no basis for a finding. What we said in the *Dowagiac* case is equally true here,—that what is required is not mathematical exactness but only a reasonable approximation. That, after all, is a matter of judgment; and the testimony of those who are informed by observation and experience may be not only helpful but, as we have said, may be indispensable. Equity is concerned with making a fair apportionment so that neither party will have what justly belongs to the other. Confronted with the manifest injustice of giving to petitioners all the profits made by the motion picture, the court in making

an apportionment was entitled to avail itself of the experience of those best qualified to form a judgment in the particular field of inquiry and come to its conclusion aided by their testimony. We see no greater difficulty in the admission and use of expert testimony in such a case than in the countless cases involving values of property rights in which such testimony often forms the sole basis for decision.

Petitioners also complain of deductions allowed in the computation of the net profits. These contentions involve questions of fact which have been determined below upon the evidence and we find no ground for disturbing the court's conclusions.

The judgment of the Circuit Court of Appeals is

*Affirmed.*

MR. JUSTICE McREYNOLDS took no part in the decision of this case.