**GOTHAM SILK HOSIERY CO., Inc. v.
ARTCRAFT SILK HOSIERY
MILLS, Inc.**

No. 910.

District Court, D. Delaware.

Dec. 11, 1942.

132

See, also, 33 F.Supp. 344.

Hugh M. Morris, of Wilmington, Del., and Samuel E. Darby, Jr., of New York City (Edwin D. Steel, Jr., of Wilmington, Del., of counsel), for plaintiff.

Sylvan H. Hirsch and Allen J. Levin, both of Philadelphia, Pa. (Stewart Lynch, of Wilmington, Del., of counsel), for defendant.

FORMAN, District Judge.

This action is brought to recover profits for patent infringement established by Judge Nields of the District Court of Delaware in the case of Gotham Silk Hosiery Co. v. Artcraft Hosiery Mills, D.C., 1 F. Supp. 643, affirmed 72 F.2d 47, certiorari denied 293 U.S. 595, 55 S.Ct. 109, 79 L.Ed. 688. Plaintiff's patent covers the construction of the top or welt of a lady's silk stockings, which, by reason of three separately spaced rows of stitching (known as hemlocks) can be adjusted to the length of the leg of the wearer by being folded over at the top. Plaintiff's invention formed no part of the leg or of the foot of the stocking. It was one of several advertised features in the entire stocking.

On November 21, 1934, Judge Nields appointed E. Ennalls Berl, Esq., Special Master for the accounting. Twenty-six hearings were held. Plaintiff waived any claim for damages before the Special Master and rested its case upon its proofs of profit. The Special Master filed his first report on December 15, 1938, in which he found that the defendant benefitted by a specific advantage from the use of the patent, derived from its price lists and circulars. He found that these fairly exhibited a policy upon defendant's part to regard the infringing stocking as having a sales value of $1.00 per dozen more than its equivalent non-infringing stocking. He found that the $1.00

difference in price represented a fair measure of defendant's profit recoverable by the plaintiff subject to a deduction of five cents as additional costs in the manufacture of the infringing welt. Since he found that defendant was liable for the sale of 202,106 dozen pairs of stockings during the accounting period he awarded the sum of $192,000-.70 together with costs to the plaintiff.

Exceptions to the report of the Special Master were filed and argument thereon was heard by Judge Nields. On May 22, 1940, he filed an opinion in which he held as follows:

"The master determined a profit without determining the cost of manufacture and the receipts from sales. Not determining the cost of manufacture nor the price received, it is impossible to determine the profit. Assuming a differential of one dollar between the patented and unpatented stocking, it is a misnomer and mistake to say that one dollar is the profit. Profit is 'the difference between cost and sales'. Providence Rubber Company v. Goodyear, 9 Wall. 788, 19 L.Ed. 566.

"There is no evidence of profit,—no evidence of the difference between cost of manufacture and receipts from sales. The master's statement of a socalled advantage is in effect introducing a new basis of recovery not justified by the statute. The statute authorizes either profits or damages. The award for infringement of a patent of this character based upon an alleged advantage is wholly unjustified.

"The case is remitted to the special master for the determination of the profit, if any, received by defendant from its infringement of the Tilles patent." Gotham Silk Hosiery Co., Inc., v. Artcraft Silk Hosiery Mills, Inc., D.C., 33 F.Supp. 344, 346.

The parties introduced no further evidence before the Special Master being content to stand upon the record theretofore made.

Following the return of the case to the Master defendant alleged it learned for the first time that the Master had, prior to his appointment, acted as counsel for the plaintiff, Gotham Silk Hosiery Company, and on October 4, 1940, defendant made application to Judge Nields for an order to disqualify the Special Master for the reason stated and nullify all proceedings had in the action. This application was denied.

On September 19, 1941, the Master filed a Further Report to which exceptions have been taken. These were heard and briefs submitted to this court sitting by special designation in Wilmington, Delaware.

The Master's Further Report incorporated the findings of fact contained in his original report because he assumed that the court did not intend to disturb them. The Further Report was designed to show:

"(1) If defendant realized a profit—that is to say, if it sold the infringing stockings which it had made or had made for it at a greater price than the cost of manufacture and sale, and if so,

"(2) The portion thereof to which plaintiff is entitled."

Prior to the commencement of the hearings before the Master in 1934 an order had been entered requiring the defendant to file its account pertaining to such matters as the number of dozens of pairs of stockings manufactured from September 22, 1931, to the date of the accounting and of the number of dozen pairs of stockings sold during each calendar month from that date, the price received, the cost in detail of making or acquiring the stockings so made or sold, the total profits of the defendant, the number of such stockings on hand, and the details of each item claimed by the defendant as deductible costs in arriving at its stated profits.

Defendant filed an account on January 23, 1935, in which it set forth in monthly periods from September of 1931 to October of 1934, in numbers of pairs, and numbers of dozens of pairs, the alleged total of infringing stockings produced and shipped, the range of selling prices per dozen pairs for various styles included in the statement and other details. This was later introduced in evidence by the defendant and found its source in a book, the only record of the number of infringing stockings made and sold, which defendant alleged it kept and offered in evidence. This book purported to be a daily record of the defendant's production and sale of infringing stockings covering substantially the accounting period and was known as the "Tri Length Book." The supporting data for this book such as production and sales records, shipping vouchers and invoices to defendant's customers had been destroyed. The book purported to show a daily record from September 22, 1931, to October 26, 1934, of infringing pairs of stockings pro-duced, shipped, pairs of first quality, irregulars (seconds and thirds), a breakdown of the numbers of styles and pairs of returned worn hose. Tabulated in defendant's exhibit 24 it showed a total of 27,652½ dozen pairs produced and 33,522$^{11}$⁄$_{12}$ dozen pairs (calculated from pairs shown in the book) shipped during the period. These included the firsts and the irregulars. The record was allegedly kept by a Miss Kleinschrodt, secretary to the president of the defendant, Mr. J. Kugelman, under his personal supervision. The Master found that the book failed to reflect a record of one of the admittedly infringing styles for a period of about eight months. He also found that no record was kept of a style number shown to have been advertised by the firm of Lord and Taylor as an infringing stocking. He concluded that an analysis of seventeen accounts of the defendant, hereinafter referred to, demonstrated a number of infringing style numbers sold to these accounts that made the total recorded number of infringing stockings to all customers of the defendant appear clearly out of proportion, for example, he found that 385$^9$⁄$_{12}$ dozen pairs of style 40 L were sold to the seventeen accounts in a period from March 12, 1932, to the end of the accounting period, but the defendant's book showed only 256$^9$⁄$_{12}$ dozen pairs of this style number sold to all of its customers during that period and they numbered in the hundreds. The Master found that Mr. Kugelman's testimony that infringing and noninfringing stockings were sold under the same style numbers was not worthy of belief. He concluded that the record was unreliable and was inclined to accept a theory of the plaintiff that the book was not a daily record commenced at the beginning of the accounting period in September of 1931 but was contrived after an order had been entered in December, 1932, directing that the defendant report its production of infringing stockings to the court each month in pairs (instead of in dozens of pairs). All records and references to production of stockings were calculated in dozens or fractions of dozens of pairs of stockings except in the instances of this order and the book refers to pairs of stockings rather than dozens of pairs. These and other manifestations caused the Master to doubt the bona fides of the defendant's "Tri Length Book" and so he looked to other sources for evidence, of the total sale of the infringing stockings, costs and propor-

tionate profits, if any, to which the plaintiff was entitled.

The Master's inquiry led into three channels. First, he explored to discover the number of infringing stockings which the defendant sold during the accounting period, secondly, the profit from the sale of such infringing stockings and thirdly, the profits attributable to the infringing welt constituting plaintiff's patent.

It was shown by the evidence that the defendant published certain price lists identifying various types of stockings by style numbers. Plaintiff was able to obtain and offer in evidence defendant's invoices to 17 of its customers likewise identifying the stockings sold by selected style numbers. These invoices showed the dollar value of the selected style numbers as well as the amount of sales of all styles to those accounts. The Master found that the plaintiff, with regard to these seventeen accounts, was enabled to apportion the infringing and noninfringing business both as to quantity, that is to say dozens of pairs of stockings, and as to dollar totals, and ascertain what proportion of the business of these 17 accounts was attributable to the sales of infringing numbers. From the general account books of the defendant which were available but which contained no information as to styles of stockings sold to the different customers, the Master held that plaintiff was able to ascertain what proportion of defendant's total business was attributable to the 17 accounts. Having previously ascertained the proportion of infringing styles to the total business in the case of the 17 accounts it applied that proportion to the total business done by the defendant during the accounting period, and computed through this formula both the number of dozens of pairs of infringing style numbers sold by the defendant during the accounting period, and the dollar amount which represented the proceeds of such sales.

Exhibit P-2 is a price list for the fall of 1931 and under the general heading "Tri-length Styles" lists numbers 10, 30, 70, 80 and 90, and represents their welts to contain "three graduating hems separated by three triple lace 'Hemlocks'."

Exhibit P-3 for the spring and summer of 1932 likewise lists under the same general heading, and with the same descriptive matter style numbers 10, 30, 70, 80 and 90. Style numbers 2 and 40 L are described as

"tri-length". An illustration of the welt of the "tri-length" style clearly represents the infringing stocking.

Exhibit P-4 for the fall and winter of 1932 and 1933 also contains the general heading "Tri-length Styles" together with an illustration. Style numbers 10, 30, 70, 90, 2 and 40 L are listed thereunder and are clearly infringing.

Exhibit P-5 for the spring and summer of 1933, January to July, advertises the "New Improved Artcraft 'Tri-length'" with an illustration depicting a single deep welt finished with "Triple Run-preventing Lace 'Hemlocks' ", rather than a welt with three graduating hems, the infringing welt as represented in Exhibits P-2, P-3 and P-4. Style numbers 2, 10, 30, 70 and 90 are represented to contain the "new improved tri-length top." Style number 40, however, is described as in the prior exhibits and is represented to embrace the "Tri-length top (3 graduating hems with triple lace 'Hemlocks')", admittedly the infringing welt.

Exhibit P-60 for the fall and winter of 1933 and 1934 under the general heading "Magic Fit" describes style numbers 4, 80, 40 L and 2 as stockings with "three graduating hems with triple lace 'Hemlocks' ", and defendant admits these styles to be infringing. Style number 70 in this exhibit, however, is represented as a noninfringing stocking.

Exhibit D-10 for the spring and summer of 1934 uses the same general heading "Magic Fit" as in Exhibit P-60, and style numbers 4, 40 L, 80 and 2 appearing thereunder are represented to contain "Magic Foot and Magic Top" and "Extra heavy * * * welt with triple lace 'Hemlock' stop runs". Style number 70 is represented to contain "Magic Foot and Magic Top" and "Extra heavy * * * welt".

Exhibit D-11 for the fall and winter of 1934 and 1935 also uses the same general heading "Magic Fit", and thereunder style numbers 4, 80, 2 and 40 L are represented to contain "Magic Fit welt with triple (double in style number 80) lace 'Hemlocks' ".

The report of Ernst and Ernst, plaintiff's accountants, which was accepted by the Master, is based on the assumption that style numbers 2, 4, 10, 30, 40 L, 70, 80, and 90, were infringing styles. Using the invoices to the 17 accounts, and the formula already mentioned, the accountants esti-

mated that defendant sold 202,106 dozen pairs of the infringing stockings during the accounting period. The following table shows the style numbers involved in the totals of the four periods used by the accountants.

| Period | Style Numbers | Total |
|---|---|---|
| [1] 1931 | 10, 30, 70, 80, 90 | 22,249 |
| [2] 1932 | 2, 10, 30, 40L, 70, 80, 90 | 75,325 |
| [2] 1933 | 2, 4, 10, 30, 40L, 70, 80, 90 | 67,250 |
| [3] 1934 | 2, 4, 10, 30, 40L, 80, 90 | 37,282 |
| | Total ........ | 202,106 |

Defendant argues that it was erroneous to conclude that infringing stockings only were sold under the selected style numbers, because noninfringing stockings were sold under the same style number. It offered the testimony of its president, Mr. J. Kugelman, as well as that of a number of buyers to substantiate this contention. It sought to show that the buyers did not base their purchases upon the price lists or circulars but bought from actual samples of the stockings presented to them by its salesman. The Master discredited the testimony of each of these witnesses, and relied upon the testimony of Alfred Hahn, defendant's plant superintendent during the accounting period until March of 1933, that there positively was no dual manufacture under similar style numbers during the period of his employment. The Master also concluded that it was immaterial whether or not there was dual manufacture under the same style numbers following that date, because if there were it was done with intent to confuse and obstruct the accounting, and, therefore, the burden of segregating infringing from the noninfringing stockings was upon the defendant. Since defendant did not sustain that burden the Master concluded that he had no alternative but to find that all stockings sold under infringing style numbers must for purposes of the accounting be considered as infringing stockings.

We agree that there was ample justification for the Master to disregard the "Tri Length Book" as maintained by the defendant and to decline credit to the testimony of its president, Kugelman, in the face of the discrepancies pointed out in his testimony. We can go still further with the

Master and agree that the defendant placed itself in the position of appearing to have deliberately confused the accounting or the distribution or both of the infringing stockings and that under such circumstances it is responsible for the confusion it has caused and if there can be a demonstration of the number of stockings distributed both infringing and noninfringing without mathematical exactness but with even approximate certainty that the defendant should be liable for all such stockings shown to have been distributed. However, the entire weight of the Master's formula for calculation of the number of infringing stockings for which defendant must account rests upon the price lists and circulars.

The table shown above lists the year of sale of the various style numbers displayed. It does not, however, show when those style numbers were manufactured. For example, style number 70, an infringing stocking manufactured in 1931 could conceivably be sold in 1933, and style 70 manufactured in 1933, a noninfringing stocking according to the description in Exhibit P-60, could be sold in the same year. If we assume that the style numbers sold correspond with those represented in current price lists, and this is more likely, it appears that for the year 1934 there was no current price list showing style Nos. 10, 30 and 90. Exhibits P-60, D-10, D-11. It also appears that style number 40, Exhibit P-5, which defendant admits to be infringing is not included.

It does not appear from the price lists that the selected style numbers are all in fact infringing. We are not prepared to say that the "New improved tri-length top" style Nos. 2, 10, 30, 70, and 90 as shown in Exhibit P-5, the price list for January-July, 1933, that "Magic Fit Styles" with "Magic Foot and Magic Top" with "Extra heavy * * * welt with triple lace 'Hemlock' stop runs", Nos. 4, 40 L, 70, 80 and 2 as shown in the price list for the spring and summer of 1934, Exhibit D-10, and that "Magic Fit Styles" with "Magic Fit welt with triple lace 'Hemlock'" Nos. 4, 80 (double lace "Hemlock"), 2, and 40 L as shown in the price list for the fall and winter of 1934, Exhibit D-11, are infringing styles. This brings us to the conclusion that the price lists beginning with the spring

---

[1] Oct. 1 to Dec. 31
[2] Total year

[3] Jan. 1 to Oct. 31.

and summer of 1933 do not justify the assumption that the selected style numbers represent infringing stockings throughout the period of the accounting. We do not mean to suggest that no infringing styles were manufactured and sold following the spring of 1933. On the contrary, the price list for the spring and summer of 1933, Exhibit P-5, does not describe style No. 40 as the "New improved tri-length top" but as a "Tri-length top (3 graduated hems with triple lace 'Hemlocks')" as in prior price lists, and defendant admits this to be an infringing style. Also, the price list for the fall and winter 1933-1934, Exhibit P-60, represents style Nos. 4, 80, 40 L and 2 with welts containing "Three graduated hems with triple lace 'Hemlocks'", and defendant admits that these styles are infringing. Furthermore defendant itself admits in its "tri length" account book that some infringing stockings were distributed in 1933 and 1934.

The difficulty presented herein is that the price lists do not support the conclusion reached with respect to the number of dozens of infringing stockings sold. Evidence is lacking to show that stockings sold with "new improved tri-length tops" or with "Magic Foot and Magic Top" with "Extra heavy * * * welt with triple lace 'Hemlock' stop runs", or with "Magic Fit (and) welt with triple lace 'Hemlocks'" were in fact infringing or that these descriptions intended to designate infringing style numbers. In its absence and for the reasons pointed out we are constrained to the conclusion that there has been a failure of proof of the number of infringing stockings for which defendant was liable to account.

To determine profits the accountants, Ernst & Ernst, applied proportions derived from the 17 accounts heretofore mentioned to defendant's total sales found in its accounts receivable ledger cards. Cost figures furnished by plaintiff's expert, Arthur F. Morton, were deducted from this sum and the conclusion was made that defendant's total profits on infringing sales were $589,331.21.

The primary attack in this phase of the accounting was focused upon the competency of the testimony of the expert Morton with regard to costs. Defendant argues that an expert may be used only to the extent that actual profits cannot be proved from its books or the testimony of its employees. Morton's estimates are based neither upon a study of defendant's physical plant nor upon defendant's books but upon elaborate comparative studies including analysis of the product of the defendant and estimates of costs all fully described in the Master's report. Therefore, items of cost such as rent, executive salaries, superintendence, depreciation of and repairs to machinery, as entered in the books of the defendant do not coincide with Morton's estimates.

Defendant, when ordered by the Master to file its account, showing, among other things:

"(4) The cost of making or acquiring the said stockings so made and sold, indicating the various items in detail which contribute to the cost of manufacture and/or acquisition and/or sale.

"(5) The total profits, accounts, savings and advantages derived or made by defendant through the making and/or purchase and/or sale of said stockings." (Order of December 6, 1934) reported

"4. No cost figures are available", and

"5. None. (No separate records kept on these styles)".

In view of this refusal to furnish the requested records, and in view of the fraudulent character of the Tri-Length Book, the Master felt justified in accepting cost figures as estimated by Morton to the exclusion of all items entered in defendant's books.

The relevant statute provides that if "* * * profits are not susceptible of calculation and determination with reasonable certainty, the court may, on evidence tending to establish the same, in its discretion, receive opinion or expert testimony, which is hereby declared to be competent and admissible, subject to the general rules of evidence applicable to this character of testimony * * *". 35 U.S.C.A. § 70.

The report of the Master points out that if expert testimony were confined to items absent from defendant's books, then the purpose of the statute would be destroyed. For example, as to items which the expert had overestimated, the actual cost records demonstrating the overestimate could be conveniently missing; while as to other items in which the cost might have been underestimated, the correcting records would be forthcoming.

In the case of Keystone Manufacturing Co. v. Adams, 151 U.S. 139, 14 S.Ct. 295, 38 L.Ed. 103, the Master found and the court affirmed a finding that plaintiff was entitled to the sum of $27,620 as profits for patent infringement. This finding was based on the testimony of witnesses as to costs of manufacture and profits of manufacturing concerns other than the defendant. The Court stated:

"In the light of these decisions, there was error in the court below, not in any formal disregard of the rule restricting the plaintiff's recovery to the profits actually realized, but in permitting the plaintiff to prove, not the defendant's profits, but those realized by other companies. This was, in effect, showing what, in the opinion of the master and the court, 'he might reasonably have made, and not those which he did make.'

"The fallacy of this application of the rule is obvious, for nothing is more common than for one manufacturing concern to make profits where another, with equal advantages, operates at a loss.

"The learned judge seems to have thought that the course of the defendant, in not himself disclosing the condition of his business, justified the master in estimating its profits upon the basis of those of other similar establishments. But, as we have seen, the burden of proof was upon the plaintiff. He relied, notwithstanding defendant's objections, on incompetent and irrelevant evidence, and the decree in his favor, in so far as it awards more than nominal damages, cannot be sustained." 151 U.S. 139, 148, 149, 14 S.Ct. 295, 299, 38 L.Ed. 103.

Expert witnesses on the subject of costs were also used in the case of Producers' & Refiners' Corporation v. Lehmann, 9 Cir., 18 F. 2d 492, but therein the witness had inspected the properties which defendant operated, observed the manner of operation and discussed the subject with the employees and the officers of the defendant.

"To arrive at the cost and expense of the production, treatment, and sale of the treated oil, which, as we have seen, includes all the oil produced during the infringing period upon the three leases, the plaintiff also introduced in evidence estimates prepared by the witness Wilrich as an engineering expert. These estimates were made by the witness after an inspection of the properties in question, and after observ-ing the manner of operation upon the leases and from statements made by some of the employees and officers of appellant. The findings of the master were based upon these estimates as to the expenses and costs of production, treatment, and sale of the oil produced, treated, and sold during the infringing period.

"Clearly these estimates were not the best evidence available to the plaintiff to prove these facts. The best available evidence of these matters presumably was the books of appellant; equally competent for the plaintiff would have been the testimony of the employees and officers of appellant acquainted at first hand with the facts. It is claimed that plaintiff was justified in resorting to this character of proof, because appellant had stated, in answer to the queries of the master, that it was impossible to give the information called for. But appellant did not say that it was impossible to give the information called for by the master for the total production of the leases during the infringing period. The defendant before the master and to the trial court strenuously insisted, and here insists, that the Wilrich estimates were incompetent; that the only competent evidence to prove the expense, costs, and charges to be deducted from the gross profits was the books of the company, or the testimony of its officers and employees acquainted with the facts. In our opinion, the contention that plaintiff was not justified in resorting to estimates of costs and expenses based upon hearsay and the opinion of the witness, as was done in this case, is well taken and must be sustained." 18 F.2d 492, 499.

■■ Defendant's failure to furnish the record requested by the Master does not make competent that which otherwise would be incompetent. Whether or not it presented cost data pursuant to the terms of the order is immaterial, for the fact is that the general records of defendant, and the testimony of its officers, both of which were prerequisite to competent estimates of costs were available to plaintiff with or without defendant's consent. Also, we think the Master was unjustified in assuming that the fraudulent character of the "Tri-Length Book" reflected upon the integrity of every record kept by the defendant and justified Morton's disregard thereof. Otherwise, the acceptance and use of de-

fendant's account receivable ledger cards showing total sales which were inextricably involved in the formula from which total profits were found, is not consistent.

Having concluded that the defendant made a profit of $589,331.21 on the sale of 202,106 dozen pairs of infringing stockings, the Master then decided that the total profit was divisible and undertook to apportion the part thereof attributable to the infringing welt. He concluded from defendant's price lists that stockings containing the infringing welt sold for $1.00 a dozen more than stockings similar in detail except for the infringing welt. He, therefore, awarded plaintiff the sum of $202,106. The Master admitted that the test used was not infallible since there was no difference in price as between some of the style numbers corresponding in detail except for the infringing welt. However, he pointed out that this did not alter the fact that when the Tri-length stocking was first put on the market by defendant, and for a substantial period thereafter, defendant fixed in its price lists an additional value of $1.00 per dozen pairs to the Tri-length stocking. He also justified his conclusion on the ground that following the decree of the Court finding infringement and ordering an accounting the defendant deliberately set about to obscure things so as to make proof of profits impossible. Finally, the Master disregarded testimony of buyers to the effect that they paid no more for Tri-length stockings than for stockings without the infringing welt, since he was of the opinion that the price lists refuted their testimony.

In the case of Westinghouse v. Wagner Mfg. Co., 225 U.S. 604, 32 S.Ct. 691, 56 L.Ed. 1222, 41 L.R.A., N.S., 653, the Court had before it an action for an accounting for patent infringement. The infringing device was only a part of a transformer manufactured by defendant, and, hence, created only a portion of the profits from the sale of transformers in their entirety. The difficulty in such a case is apparent, because a defendant with ingenuity may smother the patent with improvements belonging to himself and others and make it impossible for a plaintiff to sustain his burden of proof, the general rule being that he must prove profits, and in those cases where apportionment is necessary he must prove to what extent the infringing feature contributed to the profits realized. In those cases where confusion is so pronounced that apportionment of profits is impossible the problem is whether or not the plaintiff should be given all profits realized from the sale of a device containing infringing and noninfringing features or none in which case the defendant would be permitted to take advantage of his own wrong. The court concluded that the plaintiff initially must prove profits realized from the sale of infringing transformers, and then exhaust all available means of apportionment, such as the records and testimony of employees of the defendant and expert testimony, and then if apportionment is shown to be impossible, the burden of separation shifts to the defendant. See, also, Dowagiac Mfg. Co. v. Minnesota Plow Co., 235 U.S. 641, 35 S.Ct. 221, 59 L.Ed. 398; Garretson v. Clark, 111 U.S. 120, 4 S.Ct. 291, 28 L.Ed. 371; Egry Register Co. v. Standard Registry Co., 6 Cir., 23 F.2d 438; Seeger Refrigerator Co. v. Amer. Car & Foundry, 3 Cir., 219 F. 565.

In those cases where apportionment is necessary only a "reasonable approximation [is required] which usually may be attained through the testimony of experts and persons informed by observation and experience." Dowagiac Mfg. Co. v. Minnesota Plow Co., 235 U.S. 641, 35 S.Ct. 221, 223, 59 L.Ed. 398. As may be expected experts are usually at considerable odds on their estimates, but the Master is not confined to their calculations for he may make his own reasonable approximation based thereon. Sheldon v. Metro-Goldwyn Pictures Corp., 309 U.S. 390, 60 S.Ct. 681, 84 L.Ed. 825; Baseball Display Co. v. Star Ballplayer Co., 3 Cir., 35 F.2d 1; United States Frumentum Co. v. Lauhoff, 6 Cir., 216 F. 610.

The Master's conclusion that the defendant fixed an additional price of $1.00 a dozen for Tri-length stockings is based on Exhibit P-51, a circular for the spring and summer of 1932, and Exhibit P-3 for the same period. Exhibit P-51 shows Regular styles without style number descriptions at $9.50, $11.50, $12.50, and $14.50 a dozen, and Tri-length styles without style number descriptions at $10.50, $12.50, and $14.50 a dozen. Hence, it is true that the cheapest infringing stocking sold for $1.00 a dozen more than the cheapest regular style.

Exhibit P-3 is specific with reference to style numbers, and the following table indicates comparisons in price between Regular

style numbers similar in description to Tri-length stockings except for the infringing welt.

The price lists do not warrant the inference that infringing stockings sold for $1.00 more than their noninfringing count-

| Regular Styles | | | Tri-Length Styles | |
|---|---|---|---|---|
| No. | Price | | No. | Price |
| [4]22 | $ 9.50 | compared with .......... | 30 | $10.50 |
| 66 | 9.50 | " " .......... | 10 | 12.50 |
| 77 | 11.50 | " " .......... | 70 | 12.50 |
| 88 | 9.50 | " " .......... | 80 | 10.50 |
| [5]44 | 11.50 | " " .......... | 40L | 12.50 |
| 99 | 14.50 | " " .......... | 90 | 14.50 |

The following table demonstrates that the differential of $1.00 per dozen cannot be applied in every case. It represents comparisons in price between Regular style numbers similar to Tri-length stockings except for the infringing welt.

erparts. In fact, where the differential exists it is definitely the exception and not the rule. Furthermore, in those style numbers where the differential appears, there is no positive proof that it is attributable to the infringing welt. We realize that ap-

| Exhibit | Regular Styles | | | Tri-Length Styles | |
|---|---|---|---|---|---|
| | No. | Price | | No. | Price |
| P–4 | 22 | $ 7.50 | compared with | 30 | $ 7.50 |
| P–3 | 66 | 9.50 | " " | 10 | 12.50 |
| P–4 | 66 | 7.50 | " " | 10 | 10.50 |
| P–5 | 66 | 7.50 | " " | 10 | 10.50 |
| P–4 | 44 | 10.50 | " " | 40L | 10.50 |
| P–2 | 99 | 14.50 | " " | 90 | 14.50 |
| P–3 | 99 | 14.50 | " " | 90 | 14.50 |
| P–4 | 99 | 12.50 | " " | 90 | 12.50 |
| P–4 | [6]222 | 14.50 | " " | 2 | 14.50 |
| P–60, D–10 | | | | [7]70 | 10.00 |
| P–60, D–10 | | | | [8]80 | 12.00 |
| D–11 | | | | [8]80 | 10.00 |
| | | | | [9]4 | |

Defendant offers the following comparisons between style numbers similar in every detail according to the price lists except for the presence of a "Hemlock" stop run to show that price differentials cannot be inferred from the bare descriptions in the price lists.

portionment in any case is difficult, and we agree with the Master that the defendant has been deliberately uncooperative. Defendant knew as early as October 28, 1932 (the accounting period extended from September 21, 1931 to October 31, 1934), that it would be called upon to account for.

| Exhibit | Price | Style No. | Styles with "Hemlock" Stop Runs No. | Price |
|---|---|---|---|---|
| P–2 | $11.50 | 66 | 44 | $12.50 |
| P–3 | 9.50 | 66 | 44 | 11.50 |
| P–4 | 7.50 | 66 | 44 | 10.50 |
| P–46 | 11.50 | 66 | 44 | 14.50 |
| P–46 | 14.50 | 99 [10] | [11]333 | 18.50 |

[4] Styles 22 and 30 differ not only in Tri-Length infringing feature, but they do not compare in heel, sole and toe.

[5] Testimony and not price list demonstrates similarity with No. 40L except for Tri-Length infringing feature.

[6] Also differs from Style No. 2 in that it has "Dainty open-work clock."

[7] No corresponding regular number except in P-3.

[8] No corresponding regular number except in P-2 and P-3.

[9] No corresponding regular number

[10] Sheer chiffon

[11] Chiffon

profits. It was unable to furnish plaintiff with the number of infringing stockings sold or the price at which they were sold. Disregarding its professed inability to furnish cost data, its refusal to turn over honest calculations based on simple additions, to say the least, is reprehensible. But as we have seen, plaintiff has the burden of proving profits notwithstanding defendant's conduct, and if the infringing device contains features other than the infringing one he also has the burden of segregating profits unless he shows that the defendant has rendered that impossible, Westinghouse v. Wagner Mfg. Co., 225 U. S. 604, 32 S.Ct. 691, 56 L.Ed. 1222, 41 L.R. A., N.S., 653, in which case the burden shifts to defendant.

Exhaustive probing of the defendant's employees (with the exception of Hahn who served it only for about half of the accounting period) and its records and the offer of expert evidence as to the proportionate value of the infringing welt on the stocking with relation to the whole was not undertaken by the plaintiff. In the first hearing it demanded all profits on the stockings it alleged were infringing. It declined the Master's invitation to offer further testimony and before us rested upon his theory of apportionment.

There can be no doubt that defendant utilized the infringing stocking top extensively up to 1933. The testimony of Mr. Hahn points to that and it is quite probable, as the Master found, that outside manufacturers were called upon to supplement its output of such stockings. In the late part of 1932 plaintiff scored its victory against the defendant on the patent. Defendant was obliged to file monthly reports with the court concerning its use of the infringing patent pending appeal. Its enthusiasm for the patent probably waned from then on and evidence of its exploitation during 1933 and 1934 definitely diminishes.

The conduct of the defendant throughout has been such as to encourage the urge not only to assess damages against it but to penalize it as well, if that were possible. It is not easy to turn the plaintiff away empty handed. It is also recognized that a wide latitude should be given to the Master in the formulation of his decision because cases of this type cannot terminate in exact results, and his conclusions developed from first hand contact with the witnesses and investigation of the evidence are deserving of high respect. The statute and the cases favor the theory that an infringer shall not be permitted to profit by his own wrong. The Master in this case has extended himself to perform this direction. However, the plaintiff has simply failed to give him the groundwork in the way of supporting evidence. He has been obliged to construct his decision upon a foundation of speculation that is not justified even in the light of a liberal expansion of the usual requirements of legal proof. The plaintiff, as has been indicated, rested its claim on profits. It tendered no evidence as to damages or reasonable royalty. The only evidence concerning the latter was put forward by the defendant. It introduced an unaccepted offer made by the plaintiff to defendant after the first decision in the case and gave its own opinion of a reasonable royalty. There is no basis upon which to bind the plaintiff by such evidence.

The plaintiff cannot complain of lack of opportunity to exploit its claim in any department because after the matter was sent back to the Master he invited further proof from both parties and they chose to furnish none.

It follows that calculations with regard to the number of infringing stockings sold, and the profits realized from the use of the infringing welt are erroneous. We are, therefore, left with nothing from which we may make a reasonable approximation of profits because plaintiff has failed to furnish any evidence from which this can be made. We can neither ascertain from this record the number of infringing stockings sold nor the proportionate profit derived from the use of the infringing welt and we cannot say that it has been shown that defendant has rendered such proof an impossibility even in the face of its uncooperative attitude and thwarting tactics. Plaintiff, therefore, has failed to sustain its burden of proof and reluctantly we must disagree with the Master and confine its award to a nominal recovery. Keystone Mfg. Co. v. Adams, 151 U.S. 139, 14 S.Ct. 295, 38 L.Ed. 103; Garretson v. Clark, 111 U.S. 120, 4 S.Ct. 291, 28 L.Ed. 371; Robbins v. Illinois Watch Co., 7 Cir., 81 F. 957.

Defendant objects to the allowance to Ernst & Ernst, accountants, in the sum of $10,314.07, and the allowance to Arthur F. Morton Company in the amount of $2,665.50 for services and expenses of its expert, Arthur F. Morton, in computing defendant's costs of manufacture and sale.

In view of the conclusion herein reached that nominal profits only are allowable, the objection is sustained. Everest v. Buffalo Lubricating Oil Co., C.C., 31 F. 742; Dowagiac Mfg. Co. v. Minnesota Moline Plow Co., 8 Cir., 183 F. 314, reversed on other grounds, 235 U.S. 641, 35 S.Ct. 221, 59 L.Ed. 398; Kirby v. Armstrong, C.C., 5 F. 801; Garretson v. Clark, Fed.Cas. No. 5,250, affirmed 111 U.S. 120, 4 S.Ct. 291, 28 L.Ed. 371.

There remains for consideration defendant's objection that the Master is disqualified to act herein, and that all proceedings before him should be nullified. We do not feel that we would be warranted in considering this objection because the contention was overruled by order of Judge Nields, dated October 4, 1940, and this court does not sit as an appellate tribunal in this respect.