GUTHRIE McCLINTIC, Plaintiff, *v.* EDWARD SHELDON et al., Defendants.

Supreme Court, Trial Term, New York County, July 30, 1943.

*Louis Nizer* and *Walter S. Beck* for plaintiff.

*Arthur F. Driscoll* and *Milton M. Rosenbloom* for Edward Sheldon, defendant.

BERNSTEIN, J. The plaintiff, a well-known theatrical producer, has brought this action against the defendants, well-

known authors and playwrights, to recover one half of a fund of $172,413.11, less legal fees and disbursements, received by them in satisfaction of a judgment which they recovered against Metro-Goldwyn Pictures Corporation, a motion picture producer, in an infringement suit brought by them in the Federal court. That suit was instituted in the United States District Court in and for the Southern District of New York in 1932 and after many appeals, two of them to the United States Supreme Court, terminated in the authors' favor in 1940. (*Sheldon* v. *Metro-Goldwyn Pictures Corp.*, 7 F. Supp. 837, 26 F. Supp. 134, 81 F. 2d 49, 106 F. 2d 45, 298 U. S. 669, 309 U. S. 390.) In this action only the defendant Sheldon was served or appeared.

The facts established by the plaintiff and relied upon for a recovery herein are the following: The defendants had written a play entitled " Dishonored Lady ". On December 5, 1928, they entered into a written contract with the plaintiff granting him an exclusive license to produce and present the play on the regular speaking stage. By its terms the contract not only included the express provisions of a signed document but incorporated, by reference, the provisions of a so-called Minimum Basic Agreement between the Dramatists' Guild of the Authors' League of America, Inc. (of which the authors were members) and the Manager (the producer). After providing for the payment by the plaintiff to the defendants of certain specified royalties for the license described, the contract, so far as applicable to the controversy here, stipulated that on condition that the plaintiff shall have presented " the play under his own direction for * * * 24 times in New York City * * * he shall have a further interest in the play and/or in the profits derived therefrom ", to the extent of 50%, in stock and superstock rights, radio rights, little theatres, Chautauqua, repertoire production and tent shows, foreign language rights in the United States, condensed and tabloid versions, adaptations, et cetera, and motion picture rights. Each class of those rights was more fully described and particularized in the Minimum Basic Agreement in phraseology which spoke of the " sale or other disposition " of the rights and of the " net profits, royalties and/or sums derived " from those rights which were to be divided between the parties. Finally, the contract also stipulated: " The rights of the manager [the plaintiff] are specifically limited to those granted herein. All other rights * * * and all rights which may hereafter come into existence, shall always be reserved to the

author [the defendants] ", and " The copyright covering any play or the right of copyright is not assigned or released by the author and all the author's right, title and interest therein are expressly reserved to him."

The play having had a New York City run of well over the prescribed minimum period, the plaintiff became entitled to share in the motion picture rights of the play and in all proceeds derived therefrom. In 1930, the defendants negotiated a sale of the motion picture rights to Metro-Goldwyn Pictures Corporation for $30,000 but, due to censorship rules, it failed of consummation. Those rights were eventually sold to United Artists Productions, Inc., for the same amount as recently as July 7, 1942, and the proceeds were duly distributed amongst the parties in accordance with their rights under the contract. None of the other rights referred to was ever disposed of, and the stage production closed many years ago.

In 1932 Metro-Goldwyn Pictures Corporation and its affiliates produced and exhibited a photoplay entitled " Letty Lynton " which the defendants considered as an infringement upon their copyright in " Dishonored Lady ". They promptly brought suit to enjoin the infringement and to recover damages, and after an eight years' litigation succeeded as to both. Though the litigation was notorious and its progress well known to him, the plaintiff neither participated therein nor gave aid to the complainants. It was not until after the recovery and collection of the money judgment that he first asserted a claim to one half of the proceeds, upon the theory that those proceeds represented moneys derived from the motion picture rights of the play " Dishonored Lady " in which he was entitled to share under the terms of the contract. Reference is made to this fact, not in criticism of the plaintiff, but to indicate the practical construction given to the contract by all the parties thereto during those eight years. (*Insurance Co.* v. *Dutcher*, 95 U. S. 269, 273.)

Since the court was left wholly unimpressed by the efforts of the defendant Sheldon to defeat the plaintiff's claim on the basis of the several alleged breaches by him of the contract in suit, its determination of the issue of liability must depend upon the answers to two simple questions: 1. What did the grant of motion picture rights under the contract include? 2. What was the nature of the defendants' recovery in the infringement suit?

Whatever legal effect may be given to a contract granting an exclusive license to present a play but making no provision

for the incidental motion picture rights in such play (*Manners* v. *Morosco*, 252 U. S. 317; *Kirke La Shelle Co.* v. *Armstrong Co.*, 263 N. Y. 79), it has no application here, for the contract itself made express provision for such rights. The extent of the grant must consequently be measured by the terms of the contract rather than by implications found in the law. Under those terms the plaintiff was given a further interest in the play to the extent of 50% of what was derived from a sale or disposition, if any, of the motion picture rights of the play. Under those terms the sale or disposition of such rights, if any, was to be made in accordance with a set plan, the proceeds were to be received and held by a third party or "Arbiter" selected in a specific manner, and the ultimate division of net profits between the contracting parties was to follow a prescribed procedure. Thus, not only were the rights themselves provided for but the manner in which they were to be exercised was defined as well. And, lest those rights be extended beyond the contemplation of the parties or other rights be claimed, the contract specifically limited them to those granted, and reserved all others, including those not then in existence, to the defendants.

A scrutiny of the contract as a whole discloses no broader grant of motion picture rights than is customarily provided for in such contracts. A grant of "stage rights" to a play is a license to present the play on a stage with living actors. A grant of "motion picture rights" of the play is a license to use the material in the production and exhibition of a photoplay. In each case the grant involves only a right to one to use or exploit the literary work of another. As such, the right is separate and distinct from the right of ownership in the work itself. (*Goldwyn Pictures Corp.* v. *Howells Sales Co.*, 282 F. 9, certiorari denied 262 U. S. 755.)

Copyright is a right which is available only to the author or the proprietor of a literary property (U. S. Code, tit. 17, § 8). Its purpose is to secure to such author or proprietor the exclusive right to that property. It is even distinct from the property copyrighted, and its assignment will no more effect a transfer of the property than the sale of the property will effect an assignment of the copyright (U. S. Code, tit. 17, § 41). It has sometimes been described as an intangible incorporeal right in the nature of a privilege or franchise quite independent of the author's manuscript or the printer's plate. (*Buck* v. *Swanson*, 33 F. Supp. 377, 387.) In the case of a copyrighted play, the copyright is thus distinct from the play itself

(*Stevens* v. *Gladding,* 17 How. 447) and is exercised by the playwright or owner for his own exclusive benefit. (*Fox Film Corp.* v. *Doyal,* 286 U. S. 123, 130.) That the parties to the contract here recognized the distinction between the ownership of the copyright and the grant of the license is evidenced by the provision that the copyright covering the play was not being assigned or released to the plaintiff but was being reserved to the defendants.

A copyright owner of a play has two spheres of influence. On the one hand, he may grant licenses to use the play on the stage or in motion pictures or otherwise; on the other, he may prevent unauthorized persons from appropriating or using it, or obtain redress from them for such unauthorized use, or both. In the first case he is paid for the award of rights to another; in the second, for the infliction of wrongs upon himself. In the first case, the proceeds of such payment constitute moneys derived from the stage production or the photoplay exhibition, pursuant to a contract; in the second, those proceeds constitute reparations for the injury to his property, pursuant to the statute (U. S. Code, tit. 17, § 25).

The infringement of the defendants' copyright by Metro-Goldwyn Pictures Corporation and its affiliates was a tort for which they were entitled to redress under the statute by action in the Federal courts. (*Condon* v. *Associated Hospital Service of New York,* 287 N. Y. 411.) In bringing that action the defendants not only sought to recover money but to restrain the offending companies from continuing their exhibition of " Letty Lynton ". Since the granting of the injunction would necessarily have the effect of mitigating the money recovery, the conception of that recovery as profit derived from the grant of motion picture rights is hardly a logical one. The recovery was one for damages for the unauthorized appropriation or use of the defendants' copyright and not of the motion picture rights granted to the plaintiff. In other words, it was a recovery for the wrongs inflicted upon the defendants by virtue of their ownership of the copyright, and not one on account of the rights accruing to the plaintiff by virtue of his license under the contract.

Under the statute and the decisions of the court, the recovery allowed to these defendants in the infringement suit was limited to the profits of the infringers directly traceable to the infringement, but it was compensation for the injury suffered by the copyright proprietors. (*Sheldon* v. *Metro-Goldwyn Pictures Corp.,* 309 U. S. 390, 406.) It was the copyright proprietors

alone who contributed to those profits, and consequently it was they alone who were entitled to get back " that which, *ex aequo et bono,* is theirs " (309 U. S. 390, *supra,* at p. 399).

In the light of the foregoing analysis of the meaning of the contract between the parties and of the nature of the recovery in the infringement suit, it is evident that the plaintiff is entitled to no part of the proceeds paid in satisfaction of the judgment, and that his complaint must be dismissed on the merits. Judgment accordingly is directed in favor of the defendant Sheldon. The plaintiff may have an appropriate exception, thirty days' stay and sixty days to make a case.