CLARK v. STATESVILLE.

(Filed November 15, 1905).

*Constitution—Permanent Roll—Qualified Voters—Registration.*

1. The fact that a voter is registered on the permanent roll as provided by the Constitution does not dispense with the necessity of his registering anew in order to become a qualified voter, whenever required by the statutes regulating the registration of voters.

2. The making of a permanent roll or record was intended to be done for the sole purpose of furnishing convenient and easily available evidence of the fact that those whose names appear thereon are not required to have the educational qualification.

3. When the law required that a majority of the qualified voters should have cast their votes for a given proposition before it becomes a law, it means a majority of the registered voters, (qualification by payment of taxes not being involved in this case).

ACTION by R. R. Clark against the City of Statesville, pending in the Superior Court of IREDELL County, heard by *Judge B. F. Long,* at Chambers at Statesville, on the 7th day of October, 1905.

. This action was brought to determine the validity of an election held in Statesville on the 15th day of August, 1905, under the provisions of chapter 375 of the Private Laws of 1905, at which election the question of issuing thirty thousand dollars of bonds for graded school, water, sewerage and electric light purposes was submitted to the qualified voters of said city. The only question in the case is, as will hereafter appear, whether a majority of the qualified voters of the city voted for the issue of the bonds. The proper authorities ordered a new registration for the said election under and by virtue of chapter 750, section 3, of the Acts of 1901.

At the time of the election, there were registered on the permanent roll of registered voters, in the office of the clerk of

the Superior Court, the names of more than 250 persons residing in Statesville, who were twenty-one years old and possessed the qualifications mentioned in Article 6, section 1 of the Constitution. These 250 voters were also registered on the old registration books of Statesville at the time the mayor and aldermen ordered a new registration, having registered their names on the said books during the month of March, 1903, but they did not register their names anew on the books of the new registration ordered by the city authorities.

The permanent roll of registered voters, kept in the clerk's office, shows the names, alphabetically arranged, of voters residing in each of the four precincts into which Statesville township is divided, but does not show which of the voters live inside the city of Statesville and which live outside. There is no permanent roll of registered voters kept by the authorities of Statesville. The only permanent roll is the one kept by the clerk of the court as above stated. Statesville township covers a larger territory than the city of Statesville, and a number of voters on the permanent roll live outside of the city limits. But the 250 voters above mentioned all live within the city.

There were 329 voters registered on the new registration books, and, of these, 223 voted for graded school bonds and 224 voted for water, sewerage and electric light bonds.

The plaintiff contends that the names of the 250 voters registered on the permanent roll, who were also on the old registration books of the city, but who failed to register their names on the books of the new registration ordered by the city, ought to be added to the 329 names on the new registration books in order to ascertain the number of qualified voters at the election. If this is done, the total number of qualified voters was 329 plus 250, making 579, and neither of the class of bonds voted for received a majority of the qualified votes.

There is no question that the act authorizing the bonds to

be submitted to a vote of the people was passed in accordance with the constitutional requirements, or that the election was regularly called, or that due notice was given of the election and also of the new registration; nor is there any objection made to the election or to the issuing of the bonds, except that herein specified.

, As stated by the plaintiff's counsel in his brief, the only question involved in this appeal is this: Were the 250 persons, whose names were registered on the permanent roll and also on the old registration books of the city but not on the books of the new registration ordered by the city, qualified voters at the election?

, After the election was held and the finding and determination of the duly authorized canvassers that a majority of the qualified voters had cast their votes in favor of issuing bonds, and when the authorities of the city, who were charged with the duty of issuing the bonds, had declared their purpose to do so, the plaintiff, a tax payer of the city, brought this action in behalf of himself and all other tax payers to declare the election void and to enjoin the issue of the bonds. The matter came on to be heard before *Judge Long* on the complaint and answer, the foregoing facts taken therefrom having been admitted, and it was adjudged upon due consideration that the election was valid and that the bonds, when issued, will be valid obligations of the city. The temporary restraining order theretofore issued was accordingly dissolved and the prayer for an injunction denied, with costs. The plaintiff excepted and appealed.

*J. B. Armfield* for the plaintiff.

*Armfield & Turner* and *Geo. B. Nicholson* for the defendant.

WALKER, J., after stating the case: The decision of this case must turn upon the construction of article 6 of the Con-

stitution and especially of section 4 thereof, it being the one
which prescribes a certain educational qualification for a
voter and the payment of his poll tax before he shall be en-
titled to vote, and provides for the registration of all who are
entitled to vote without having successfully undergone the
educational test therein required and for the making of a
permanent record of such registration. It is now contended
by the learned counsel for the plaintiff in this case, that this
registration of voters, who have not submitted to the educa-
tional test, was intended to be permanent, in the sense that
the voter can register once for all time and for all elections,
the permanent record required to be made answering as a
registration, not only for the next, but for all subsequent elec-
tions, such a voter not being required ever to register anew.
We are unable to take this view, though it has been ably ar-
gued by counsel and presented to us with great plausibility.
A consideration of article 6 of the Constitution, and of the
system of conducting elections in this State established under
its provisions, leads us, without any hesitation, to the conclu-
sion that such a construction would defeat the main purpose
of our election laws, constitutional and statutory, and produce
grave and serious results in their operation. The meaning of
this section of the Constitution is to our minds unmistakable
and we think the framers of it have selected words most apt
and adequate to express that meaning. After prescribing in
sections 1 and 2 certain qualifications for a voter, it is pro-
vided in section 3 that "every person offering to vote shall be,
at the time, a legally registered voter as herein prescribed,
and in the manner hereafter provided by law and the Gen-
eral Assembly shall enact general registration laws to carry
into effect the provisions of this article." In section 4 we
find that every person presenting himself for registration
shall be able to read and write any section of the Constitution
in our language, and before he shall be entitled to vote, he
must show that he has paid his poll tax for the previous year

on or before the first day of May of the year in which he proposes to vote, but no male person who was, on January 1, 1867, or at any time prior thereto, entitled to vote under the laws of any one of the United States, wherein he then resided, and no lineal descendant of any such person shall be denied the right to register and vote at any election in this State by reason of his failure to possess the educational qualifications therein prescribed. Provision is then made, in the same section, for a registration of all voters of the latter class and the making of a permanent roll or record of their names. This was intended to be done, most clearly, for the sole purpose of furnishing convenient and easily available evidence of the fact that those whose names appear on the list thus made are not required to have the educational qualification. The educational test did not apply to any persons who themselves were, or whose ancestors were, voters on January 1, 1867, and to ascertain and record who such persons were, the roll was required to be made. The registration and permanent roll were intended to be a substitute for the educational test or qualification, nothing more and nothing less. This appears from the language that no person thus registered "shall be denied the right to register and vote at any election in this State, by reason of his failure to possess the educational qualifications herein prescribed." In all other respects, the two classes of voters, those who are educationally qualified and those otherwise qualified under said section, are to remain on the same footing and to be subject alike to the same laws regulating the exercise of the elective franchise. The context plainly shows that this was the intention and should be the construction of the section, and good and valid reasons can be urged in its support and in favor of the policy adopted. It cannot be doubted, that it was the purpose to arrange the voters of this State into two classes, one with the educational qualification and the other without it, but with another qualification deemed to

be sufficient in the place of it. But when they are thus classified and brought to a position of equality of privilege in the exercise of the right to vote, why discriminate against the former class by requiring them to register at each successive election, if so provided by statute, in favor of the latter, by relieving them of this burden. Is it not more reasonable to suppose that the "registration and permanent record," were merely intended to preserve the evidence as to who had thus qualified themselves under the second of the provisions of that section? But the construction may well be sustained by either of two other reasons. There is a condition annexed in section 4 to the right of persons thus registered on the permanent roll to vote "in all elections by the people of this State" namely, "unless disqualified under section 2 of this article, and provided that such person shall have paid his poll tax as above required." Now section 2 requires, as a qualification for voting, a residence in the State for two years, in the county six months, and in the precinct or ward, or other election district four months next preceding the election, with a proviso that removal from one voting precinct to another shall, after four months from the time of such removal, deprive the voter of the right to vote in his former precinct, and he cannot vote of course without registration in his new precinct, and it also provides that conviction of a felony punishable by imprisonment in the penitentiary shall disqualify him as a voter until restored to citizenship in the manner prescribed by law. It is evident from this reference in section 4 to section 2, that it was not intended to do more for the one class than for the other. They must all comply with the general provisions of the election laws, enacted for the purpose of securing regularity and certainty in the methods of holding elections, and of protecting the ballot box against fraudulent voting. There is no reason why this class of voters (those who are to be on the permanent roll) should be exempt from the operation of those laws, which do

not equally apply to the other class. The object of the law-makers can be well and fully accomplished without such discrimination as between different classes of voters. But we think the very words of section 4 exclude any other conclusion as to the meaning of the organic law upon this subject. The language is that no such person who could vote, or whose ancestor could vote on January 1, 1867, "shall be denied the right to register and vote at any eléction in this State by reason of his failure to possess the prescribed educational qualifications, provided, he shall have registered in accordance with the terms of this section prior to December 1, 1908." He shall not be denied—not the right to vote—we observe, but the right "to register and vote," provided he complies with the section by registering on the permanent roll or record. Transposing terms, the result will clearly be this, that if he registers for the permanent roll, he shall not be denied "the right to register and vote" in any future election by reason of his failure to possess the educational qualification. This is too plain, we think, to admit of the likelihood of any misapprehension as to the true meaning. He must register before he can vote.

The construction which we have settled upon is the one which has received the full sanction and approval of the Legislature, as is evidenced by the language of section 9 of chapter 550 of the Acts of 1901, being the act providing for permanent registration of all persons entitled to vote under section 4 of article 6 of the Constitution, and that section of chapter 550 of the Act of 1901 is especially a legislative interpretation of the meaning of section 4 of article 6 of the Constitution in this respect, that the requirement of registration for the "permanent record," in lieu of the test of reading and writing any section of the Constitution is only a superadded qualification and does not dispense with any of the qualifications of a voter ordinarily required. This can readily be inferred from the language of said section, which

is as follows: "Any person holding a certificate of registration as herein provided for, shall be entitled to register in any county of this State, notwithstanding his inability to read and write, provided that he shall be otherwise qualified as an elector."

We have not adverted specially, in this connection, to section 3 of article 6 of the Constitution, by which it is required that every person offering to vote shall be at the time legally registered, as prescribed in that instrument and in the manner thereafter provided by law, and by which it is further directed that the Legislature shall enact "general" registration laws, as distinguished from any special registration laws, to carry into effect the provisions of that article. This manifests clearly the intent, that while the person duly registered on the "permanent record" should have the general right forever thereafter to vote in all elections, it being the same right precisely he would have had if the amendment had not been adopted, yet he shall enjoy and exercise this right subject to the other provisions of law concerning elections and to the same extent as they affect other voters who can read and write. The mere fact that he or his ancestor had voted in 1867 was surely not intended to lift him to a higher plane of citizenship or to accord to him greater privileges or immunities as a voter than the educated man—some were freed from the disability of illiteracy and others permitted to vote if they or their ancestor had voted in 1867, that is all. They were not, therefore, exempt from the full operation of all other laws intended to safeguard the ballot box and there is no sound reason why they should be. Any other provision might well have been challenged and opposed by the people, as unwise and inexpedient. This construction preserves and secures unimpaired to the voter on the permanent record the very right which it was the purpose that he should enjoy under the Constitution and to its fullest extent. Anything more than that would be an unfair discrimination against

139——32

other voters and we should not for a moment suppose the people intended that any such result should follow the adoption of the amendment.

We take it to be now thoroughly settled that, contrary to some earlier adjudications, registration is necessary to qualification as a voter, so that when the law required that a majority of the qualified voters should have cast their votes for a given proposition before it becomes the law, it means a majority of the registered voters. *Norment v. Charlotte,* 85 N. C., 387; *Southerland v. Goldsboro,* 96 N. C., 49; *Duke v. Brown, Ibid.,* 127; *McDowell v. Construction Co., Ibid.,* 514; *Wood v. Oxford,* 97 N. C., 227. These cases reversed the former rulings on the subject in *Railroad v. Commissioners,* 72 N. C., 486, and *Reiger v. Commissioners,* 70 N. C., 319. The canvassers proceeded upon the correct principle in ascertaining that a majority of the qualified voters of Statesville cast their ballots in favor of issuing the bonds. This results from our construction of the Constitution, when considered in connection with the cases just cited which define who is a "qualified voter" within the meaning of those words as used in chapter 375 of the Act of 1905, under which this election was held, and in other similar acts.

His Honor, *Judge Long,* to whom the matter was submitted for decision, was of opinion, and so adjudged, that, as far as appeared, the election was in all respects properly conducted and the result correctly declared and that the bonds will not be invalid for any reason now assigned by the plaintiff. In this opinion and judgment we concur.

Affirmed.