DREW, Justice.
The Board of County Commissioners of Sarasota County on January 14, 1952, adopted resolutions providing for the issuance, subject to a freeholders’ election thereon, of the Hospital Bonds and the Recreational Facilities Bonds hereafter mentioned. On the same date the Board of County Commissioners adopted a resolution providing for the holding of the bond election on April 2, 1952, on the following questions, which were duly published in the notice of election as required by law:
“1. Shall the Act (Chapter 27890, Special Laws of Florida, 1951) authorizing the issuance of $750,000 of bonds of Sarasota County for constructing, acquiring, improving and equipping hospitals and acquiring any land necessary therefor be approved?
“2. Shall bonds of Sarasota County, Florida, in the aggregate principal amount of $250,000 be issued at one time or from time to time for the purpose of providing funds for acquiring, constructing, improving and equipping recreational facilities in Sarasota County, including public playgrounds, bathing beaches, swimming pools, bath house and picnic sheds, acquiring any land necessary therefor, and doing any dredging, drainage, excavating, filling in or building of jetties or other construction that may be necessary for converting lands to such purposes, such bonds to mature at such time or times not exceeding 30 years from their date or dates as may be determined by the Board of County Commissioners and to *710 bear interest at the rate of 5% per an-num unless the Board shall be able to .sell all or a part of the bonds bearing interest at a lower rate or rates, such interest being payable semi-annually?”
The notice of election provided for in the above mentioned resolution contained the following statements immediately following tlie statement of the questions:
“In the event that the question set forth in paragraph numbered T’ above shall be approved, the Board of County Commissioners proposes to issue bonds of Sarasota County in the amount of $750,000 for the purpose of constructing and equipping a hospital building or buildings in Sarasota County and acquiring any land necessary therefor.
“In the event that the question set forth in paragraph numbered ‘2' above shall be approved, the Board of County Commissioners proposes to issue bonds of Sarasota County in the amount of $250,000 for the purpose of acquiring, constructing, improving and equipping recreational facilities in Sarasota County, as above stated.”
At the same meeting on January 14, 1952, pursuant to. Section 97.081, F.S.A., the Board of County Commissioners adopted a resolution calling for the re-registration of freeholder electors in Sarasota County for the purpose of securing a new up-to-date list of freeholders to be used for qualifying freeholder electors to participate in any bond election, including the April 2, 1952 election, and providing for such re-registration. The books were open for this from February 18, 1952 through March 25, 1952, and notice of the re-registration was published in the Sarasota Herald-Tribune once weekly for ten weeks, from January 16, 1952 to March 19, 1952. In addition to the publication of this notice for the time and in the manner prescribed by Section 97.081, F.S.A., the record shows that almost daily for a period of over six weeks, the newspapers and local radio stations gave great publicity to the requirements for reregistration as a necessary prerequisite to the right to vote in the coming bond election. The record shows that 5,018 freeholder electors registered during this period, and 206 freeholders qualified as such at the polls, making a total of 5,224 freeholder electors qualified to participate in the election. The record shows that 3,701 voted on the Hospital Bond issue, with 3,396 votes for and 305 votes against the bonds, and 3,612 voted on the Recreational Facilities Bond issue, with 2,804 votes for and 808 votes against the bonds.
The returns of the election were canvassed by the Board of County Commissioners on April 4, 1952, and on September 15, 1952 the Board adopted resolutions providing for the issuance of the $750,000 Hospital Bonds and the $250,000 Recreational Facilities Bonds. Petition to validate the bonds was filed in the lower court on October 20, 1952, and following its filing a notice and order to show cause was duly entered, served and published.
The State of Florida, by the State Attorney of the Twelfth Judicial Circuit, filed an answer demanding proof of the allegations in the petition and questioning the validity of the re-registration and election proceedings, and also questioning the validity of Chapter 27886, Special Laws of Florida, 1951, authorizing the issuance of the Recreational Facilities Bonds, on the ground that the constitutional requirements relative to the enactment of local acts were not complied with in the enactment of that Chapter. The answer of the State’s Attorney also questioned whether the vote approving Chapter 27890 constituted approval of the issuance of the Hospital Bonds as required by the F.S.A.Constitution.
Hearings were duly held and on November 24, 1952, the Circuit Court entered its decree validating both the $750,000 Hospital Bonds, to be issued under Chapter 27890, Special Laws of Florida, 1951, and the $250,000 Recreational Facilities Bonds, to be issued under Chapter 27886, Special Laws of Florida, 1951. It is from this decree that an appeal has been prosecuted to this Court.
The first question posed by appellant is whether the re-registration of the freeholders of Sarasota County, pursuant to Section 97.081, F.S.A., was a valid and lawful basis for determining that a majority of the qualified electors in Sarasota County who *711 were freeholders residing in said County-participated in said election as required by Section 6 of Article IX of the Florida Constitution.
While the facts do not appear in the opinion, the records in this Court show that in the case of State v. Special Tax School District No. 1, Fla., 46 So.2d 402, this Court, by a memorandum Per Curiam opinion, held Chapter 25790, Special Acts of 1949, which required the re-registration of all freeholders of Duval County as. a prerequisite to vote in bond elections to be a valid enactment. While this case dealt with a Special Act of the Legislature, its provisions were much more restrictive than those involved in the General Law under discussion in this opinion.
Section 1 of Article VI of the Florida Constitution prescribes the qualifications of electors in all elections under the Constitution. Section 2 of Article VI requires the Legislature to provide for the registration of legally qualified voters and provides that —and we use the exact language of the Constitution — “after the completion, from time to time, of such registration, no person not duly registered according to law shall be allowed to vote.”
The Legislature has long recognized the necessity for up-to-date registration records by the enactment of many laws requiring or authorizing re-registration of voters in the various political subdivisions of the State. It is common knowledge that old, out-moded registration records are impediments to orderly elections, and the trend of legislation is toward constantly up-to-date registration records. The Florida Legislature has adopted several Acts pro-' viding for re-registration at regular intervals. As example of such legislation see Chapter 15629, Acts 1931; Chapter 22173, Acts of 1943, and Chapter 22717, Acts of 1945. Such Acts are a substantial contribution to good government and orderly elections. We find nothing in the organic law of this State which prohibits periodic reregistration of voters as a prerequisite to participation in elections, so long as the machinery set up for such re-registration affords a reasonable opportunity to the citizens to register. We think periodic registration greatly facilitates a correct determination of the number of freeholders entitled to participate in a bond election. This is the best method yet devised to remove from the records those who have died or those who are no longer qualified to vote and to add to the records those who by virtue of attaining voting age (or, in the case of bond elections, have become freeholders) are qualified. In the adoption of Section 6 of Article IX -the people determined that at least one more than half of the qualified electors who were freeholders at the time of the election should participate therein to make it a valid election. To hold that re-registrations could not be required from time to time would be to frustrate the very intent of the plain language of the amendment. Holmer, Supervisor of Registration v. State ex rel. Stewart, 158 Fla. 397, 28 So.2d 586; 29 C.J.S., Elections, § 13, p. 34.
In the case of Blue v. State, 206 Ind. 98, 188 N.E. 583, 91 A.L.R. 334, the Indiana Court quotes from the Kansas case of State v. Butts, 31 Kan. 537, 2 P. 618, as follows:
“ * * * Doubtless, under the pretense of registration and under the pretext of securing evidence of voters’ qualifications, laws might be framed which would cast so much burden as really to be imposing additional qualifications. * * * The legislature cannot iby, in form, legislating concerning rules of evidence, in fact, overthrow constitutional provisions. * * * But where ample facilities for registering are furnished, and the opportunities for registering are continued down to within a reasonable time of the election day, then it ean-not be said that mere rules of evidence are abused. * * * ” [206 Ind. 98, 188 N.E. 588.]
We approve the above quotation and now turn to the question of whether the method of re-registration in the instant case afforded the citizen a fair and reasonable opportunity to comply.
The lower court made two findings of fact on this question. We quote from the final decree:
*712 “(b) It affirmatively appears from the evidence presented in this proceeding that the re-registration of freeholders preceding said bond election hereinafter detailed, and the said election itself as to the two questions presented therein, were very extensively and actively publicized in Sarasota County, Florida, prior to the respective re-registration and election dates through three newspapers, two radio stations, all of the motion picture theaters in the County, as well as by direct mail advertising, and in this publicity campaign the freeholders of Sarasota County were repeatedly urged to register and to vote in said election.”
“(a) There is no evidence in the record of this proceeding that anyone was denied his privilege to vote in the bond election on the two questions involved therein as hereinafter detailed; there was affirmative testimony presented that no one had made any complaint of being denied the privilege to vote in said election to the Supervisor of Registration of Sarasota County, Florida, in either her official capacity or as an individual; there was also affirmative testimony presented that no one had made any complaint of being denied the privilege to vote in said election to the Clerk of the Circuit Court and Ex-Officio Clerk to the Board of County Commissioners of Sarasota County, Florida, in either of his official capacities, or as an individual, and that such officer had not even heard a rumor of anyone being denied the privilege to vote in said election; and there was likewise affirmative testimony presented that no one had made any complaint of being denied the privilege to vote in said election to the State Attorney of the Twelfth Judicial Circuit of Florida, in either his official capacity or as an individual, and that such officer had not heard any rumor showing any complaint by anyone in Sarasota County with reference to their being deprived of their privilege to vote in said election.”
The above findings find complete support in the record.
 We, therefore, hold that Section 97.081, F.S.A., is a constitutional enactment; that the election involved in this appeal was duly and legally conducted and that the re-registration of the freeholders of Sarasota County was a lawful basis for determining that a majority of the freeholders of said County who were qualified electors of said county residing therein participated in said election. See Clark v. City of Statesville, 139 N.C. 490, 52 S.E. 52, 54, where the Supreme Court of North Carolina, in dealing with a very similar situation, said:
“We take it to be now thoroughly settled that, contrary to some earlier adjudications, registration is necessary to qualifications as a voter, so that, when the law requires that a majority of the qualified voters should have cast their votes for a given proposition before it becomes the law, it means a majority of the registered voters. jf: ‡ ‡ »
We now turn to the contention of appellant that the approval of Chapter 27890, Acts of 1951, in the manner set forth in the ballot did not constitute approval of the proposed hospital bonds as required by Section 6, Article IX, of the Constitution. There is no merit in this contention. The language used on the ballot was clear and susceptible of only one construction and that was that an affirmative vote was a vote in favor of the issuance of $750,000 of bonds for the purposes authorized by the Act. The identical question was before this Court in State v. City of Port St. Joe, Fla., 47 So.2d 584, and we there held contrary to the appellant’s contention.
The appellant next contends that the requirements of Section 21 of Article III of the Constitution were not complied with in the enactment of the law authorizing the issuance of the $250,000 of Recreational Facilities Bonds, because the Act provided for its ratification “by a majority of the votes cast in an election in which a majority of the freeholders who are quali *713 fied electors residing in Sarasota County shall participate” and that such approval was not secured. This is a tenuous argument. There could be no clearer evidence of the approval of the Act itself than the authorization to issue the bonds in the amount and for the purposes mentioned in the Act. We hold that the election resulted not only in the approval of the Act authorizing the issuance of the bonds, Chapter 27886, Acts 1951, as required by Article III of Section 21 of the Constitution, but also authorized the issuance of said bonds. While not directly in point, our reasoning in State v. City of Port St. Joe, supra, is clearly applicable to this situation.
The decree of the lower court is affirmed.
HOBSON, C. J., and TERRELL, THOMAS, SEBRING, ROBERTS and MATHEWS, JJ., concur.