SPECIAL TAX SCHOOL DISTRICT No. 1 of DUVAL COUNTY, et al v. STATE OF FLORIDA, et al.

No. 60-330-L.

Circuit Court, Duval County.

May 9, 1960.

Elliott Adams, Jacksonville, for petitioners.

W. A. Hallowes, State Attorney, Jacksonville, for the State.

J. Lewis Hall and William D. Barfield, both of Jacksonville, for the intervenors.

JOHN M. McNATT, Circuit Judge.

*Final decree:* Proceeding under the provisions of chapter 75, Florida Statutes 1959, petitioners seek validation of a thirty-five million dollar issue of bonds of Special Tax School District No. 1 of Duval County, Florida. Validation of the bonds is opposed by the state and two intervenors. On April 9 and 18, 1960, evidence was received in open court; oral arguments were heard April 21, and the parties were allowed through May 4 to file memoranda. The ultimate question to be decided is — *Did a majority of the qualified freeholder electors participate in the bond election as mandatorily required by the constitution?*

## *Findings*

1. The boundaries of Special Tax School District No. 1 are co-extensive with Duval County. On October 15, 1959, the board of public instruction of Duval County determined (by resolution) that it was necessary to issue bonds of Special Tax School District No. 1 in the amount of $35,000,000 for the purpose of acquiring, building, enlarging, furnishing or otherwise improving buildings or school grounds. Included in the resolution was the proposed plan for financing by levying a tax. The resolution was approved by the state superintendent of public instruction on October 20, 1959.

2. On October 22, 1959, the board of public instruction adopted a resolution calling for the holding of an election on December 22, 1959, to determine whether or not the bonds should be issued. The resolution provided that qualified freeholders "who are freeholders on the date of the election and who have specially reregistered for participation therein as required by law, shall be entitled, qualified *or* permitted to vote at said election." The resolution, including the polling places set forth therein, was published in a newspaper four times, namely: November 3, 10, 17 and 24, 1959.

3. On October 26, 1959, the board of county commissioners, pursuant to the request of the board of public instruction, adopted a resolution calling "a special reregistration of freeholder electors for the purpose of securing a new and up-to-date list of freeholders to be used for qualifying freeholder electors to participate in the bond election." The resolution provided that the *"reregistration books"* be open each day in the week *except Sunday* from

November 8th [Sunday] through December 8th, 1959," for the purpose of the reregistration of freeholder electors for voting in the bond election to be held * * * the 22nd day of December, A. D. 1959." The resolution *was not published four times* as required by law, but was published *one* time in a newspaper on October 26, 1959; and the resolution did not provide for the closing of the registration books *"at least fourteen days* prior to the holding" of the bond election as required by law (87.081, Florida Statutes), but did provide a period of *thirteen* days between the closing date of the books and the election; and the resolution did not provide that the books be "kept open" at least thirty days as required by law.

4. November 8, 1959, was on Sunday, and the registration books were not open that day, nor on the following four Sundays, nor on November 11 (Veterans Day), nor on November 26th (Thanksgiving Day), but they were open twenty-four days (including December 8th) during the period specified in said resolution.

5. During the twenty-four days the registration books were open 26,925 freeholders reregistered, including 3,862 who reregistered on December 8th, 1959. An additional 29 freeholders were permitted to reregister on December 9th, 10th and 11th, but these were kept in a separate list. Beginning a few days before the "closing" of the "reregistration books", there were long lines at the registration office and double parking and congested traffic conditions resulted from freeholders coming to the courthouse to reregister.

6. The election was held on December 22nd. The general (permanent) registration books were sent to the polling places and used along with the "reregistration books", and 6,190 (including 24 of the 29 persons who reregistered on December 9th, 10th and 11th) persons *who did not reregister* on or before December 8th were permitted to and did vote in the bond election. A total of 27,464 (note the error in addition on Pet. Ex. 35) persons voted in the bond election, 18,723 voting for and 8,741 voting against the bonds.

7. On June 27, 1955, the board of county commissioners of Duval County, pursuant to the provisions of section 98.141, Florida Statutes, adopted "the state permanent registration system." As of October 9, 1959, there were 94,311 registered freeholder electors in Duval County. The permanent registration system is kept up to date by deletions and additions, and is considered by the supervisor of registration to contain the names of freeholder

electors who are qualified to vote. In the election held November 3, 1959, in said Special Tax School District No. 1 for School Trustees and Millage, said permanent registration books (showing 94,-311 qualified freeholder electors) were used, and 10,948 voted in such election.

8. Beginning October 16, 1959, wide publicity was given to the fact that a school bond election was to be held on December 22, 1959. The newspapers, television and radio stations, pamphlets and speakers made known to the citizens of Duval County that there was a pressing need for additional school facilities, and that the matter would be determined by the bond election.

9. Through December 8th, the necessity of reregistration by freeholder electors — from November 9th through December 8th — was emphasized and reemphasized in the publicity. Thereafter, registered freeholders *who had not reregistered* were informed that they were entitled to vote in the bond election as follows —

(a) On December 11th the public was advised in one of the local newspapers that — "Officials ruled yesterday that Duval freeholders qualified to vote in general elections but who missed Tuesday's (December 8th) deadline for the special reregistration for the December 22nd school bond election still may register and vote in the election. They may do so up until the hour the polls close." On the same date another local newspaper carried large front page eight column, double headlines — "COURTHOUSE REGISTRATION OVER, BUT YOU CAN STILL VOTE DEC. 22."

(b) On December 12, both newspapers carried front page stories quoting election officials to the effect that on election day a qualified freeholder elector could vote, provided that *on election day* he went *first* to the registration office and obtained a certificate that he was qualified.

(c) On December 17, both newspapers carried front page stories to the effect that it had been decided to send the general registration books to the polls and that all freeholders *not specially reregistered* would be allowed to vote in the bond election. Similar information was contained in prominent stories in one or both of the newspapers on December 20th, December 21st and December 22nd. In a front page story on December 22nd, it was said — "There are 94,311 freeholders registered in county, and as many as that number could conceivably turn out for the election."

10.  The two newspapers referred to above had average paid circulations in Duval County, from October 26 through December 23, 1959, of 106,085 and 47,800, respectively.

11.  There was not compliance with the controlling laws in the reregistration of freeholders and in the conduct of the election.

*Opinion*

In a proceeding to validate a bond issue the state is a party defendant, and the state attorney is required to defend against or oppose — "The issuance of * * bonds [that] have not been duly authorized." Interested persons may intervene, and the circuit court must hear and determine all questions of law and fact "with the least possible delay." Any party who is dissatisfied with the final decree may appeal to the Supreme Court within twenty days. Sections 75.07-.08, Florida Statutes. The statutory proceedings for a speedy determination of the issues involved indicate the degree of public importance of a proceeding of this nature.

The constitution of Florida adopted by the people and the laws of Florida enacted by the elected representatives of the people chart the course to be followed in the issuance of bonds. The applicable provisions govern those who propose as well as those who oppose validation. In deciding the issues between the proponents and the opponents of validation, the courts can neither add to nor take from the constitutional and statutory requirements. If the proceedings for the issuance of bonds square with the requirements of law, the courts have no choice but to validate the bonds; but if organic and statutory provisions are not observed and there is not compliance with controlling law, the proceedings to authorize issuance of bonds are ineffectual, and the courts must decline to validate. Grantham v. Board of Public Instruction, 77 Fla. 540, 82 So. 52; City of Miami v. Romph, 66 Fla. 280, 63 So. 440.

In Florida, a special tax school district has *power to issue bonds only* after the same have been approved by a majority of the votes cast in an election in which a majority of the qualified electors who are freeholders participate. Section 6, article IX, and section 17, article XII, Constitution of Florida. Said section 17 provides in part — "The Legislature may provide for special tax school districts to issue bonds for the exclusive use of public free schools within any such special tax school district, whenever a majority of the qualified electors thereof who are freeholders shall vote in favor of the issuance of such bonds * * * ."

Alternative methods have been provided by the legislature for the calling and holding of bond elections. Under one procedure, the general election laws are applicable, and the statute requires that the *regular registration books* be used "to determine the number of freeholders entitled to vote." Sections 100.201, .211, .221, .241, Florida Statutes 1959. The other permissible procedure provides for the calling for — "a reregistration of freeholder electors for the purpose of securing a new and up-to-date list of freeholders to be used for qualifying freeholder electors to participate in any election called for the purpose of approving the issuance of bonds." Section 97.081, Florida Statutes. If this procedure be followed, the "record of reregistered qualified freeholders" supersedes prior records, and is used to determine the number of freeholders qualified to participate. Section 97.081 (3).

Under the reregistration statute, the board of county commissioners, upon request of the board of public instruction, is required to call for a reregistration of freeholders — "to participate in any election called for the purpose of approving the issuance of bonds for financing the school building program." Sec-97.081 (2) (b). The procedure prescribed for the reregistration is —

1. "The county commissioners * * *shall* by resolution * * call for such reregistration, * * and *shall* publish the calling of such reregistration in a newspaper of general circulation once each week for *four* consecutive weeks * * ." Section 97.081 (4) ; and,

2. "The registration books *shall* be *kept open for at least* thirty days and closed *at least* fourteen days prior to the holding of any bond election * * ." Section 97.081 (5).

The intervenors contend that the reregistration statute is unconstitutional, and that it is, in effect, a subterfuge to evade the constitutional requirement that a majority of the qualified freeholder electors participate in a bond election. They say that as Duval County has adopted the permanent registration system, in accordance with chapter 98, Florida Statutes, freeholders may not be required to reregister, and that the number of qualified freeholder electors must be determined from the regular (permanent) registration books. Section 100.241, Florida Statutes. However, section 98.041 provides that upon adoption of the permanent registration system — "electors registered shall not thereafter be required to register or reregister *except* as provided by law *or as provided for the registration of freeholders*." The quoted pro-

vision is consistent with the permissive reregistration of freeholders under section 97.081, and the reregistration statute is a valid exercise of legislative power. State v. Board of Public Instruction of Escambia County (Fla.), 113 So. 2d 368; State v. County of Sarasota (Fla.), 62 So. 2d 708.

Nevertheless, the only legal justification for a reregistration is to secure "*a new and up-to-date list of freeholder electors*" of the county "to participate in any election called for the purpose of approving the issuance of bonds * * ," section 97.081, and any other purpose would constitute an evasion of the constitutional provision that a majority of the qualified freeholders must participate in a bond election. Under the constitution and statutes, all qualified freeholder electors are entitled to vote in bond elections, and the *regular* (in Duval County, the permanent) registration books must be used and the number of freeholders determined therefrom (section 100.241), *unless there be a valid reregistration of freeholders under the provisions of section 97.081.* If the mandatory requirements of the reregistration statute be not observed, then there is no "*new and up-to-date list of freeholder electors*" from which the number of qualified freeholders may be determined.

In this proceeding, it conclusively appears that the resolution calling for the reregistration was not published the *four* times required by the statute, but was published *one* time. The books were not "*kept open*" at *least* thirty days and closed *at least* fourteen days "*prior*" to the holding of the election as required by law. In this connection the provision in the resolution that the books be opened November 8th (Sunday) was nullified by the requirement of the same resolution that they be closed on Sunday; and the provision that they remain open through December 8th was contrary to the statute that required them to be "closed *at least fourteen* days prior to the holding of any bond election." Also, after the expiration of the time fixed by the resolution of the board of county commissioners for the reregistration, the election was, in effect, opened to all of the 94,311 registered freeholder electors in the special tax school district *who had not reregistered.*

In meeting the attacks made on the bond issue, petitioners say in substance — (1) There was substantial compliance with law, because news items and other publicity concerning the reregistration may be substituted for the statutory requirements; (2) The reregistration books were "*kept open*" and "*closed*" as required, and no one is complaining that he was deprived of the opportunity

to register for or denied the right to vote in the election; (3) Neglect to follow statutory procedure may be fatal if raised before an election, but the defects are cured by the election itself. Quite a number of decisions of the Supreme Court of Florida and of courts of other jurisdictions are cited in support of the propositions urged by petitioners, but none of them decides the basic question involved in this proceeding.

As suggested by petitioners, the courts have been "benevolent" in excusing insubstantial irregularities and insignificant omissions in the holding of elections. Dade County Board of Public Instruction v. State (Fla.), 24 So. 2d 105; Bay County v. State (Fla.), 24 So. 2d 714; Town of Baldwin v. State (Fla.), 40 So. 2d 348. Likewise, there are many decisions in which the courts have declined to invalidate an election where there was not strict compliance with the *"directory"* provisions of a statute relating to the notice of an election. Phillips v. City of Rock Hill, 188 S.C. 140, 198 S.E. 604, 119 A.L.R. 656. But where a statute mandatorily requires that a definitely prescribed procedure be followed in a special election, the statute must be followed. City of Miami v. Romph, 66 Fla. 280, 63 So. 440; Merrell v. City of St. Petersburg, 91 Fla. 858, 109 So. 315; Town of Mangonia Park v. Homan (Fla. App.), 118 So. 2d 585; State v. Holmes, 358 Mo. 1237, 219 S.W. 2d 650; American Legion Phillips Post v. City of Malden (Mo.), 330 S.W. 2d 189; City of Olive Hill v. Howard (Ky.), 273 S.W. 2d 387; Ashcraft v. County of Estill (Ky.), 290 S.W. 2d 31; Annotation, 119 A.L.R. 661, et seq.

Although there is seeming conflict and confusion in the decisions, this may be attributed (to some extent) to the wording of the particular statute being construed or to the divergence of views as to whether the requirements of a statute are *"mandatory"* or *"directory"* only; but in the Romph case our Supreme Court held that a statute requiring a specified notice in a special bond election was mandatory, saying — "The statute makes the publication of the notice of the election a prerequisite to the issue of the bonds, therefore such publication is not merely formal and directory; and the required publication cannot be dispensed with upon the theory that it does not appear that the electors were misled by the failure to make the publication for the statutory period."

The proposition that irregularities and defects which might have been successfully urged *before* the election are cured *by* the election (Pearson v. Taylor (Fla.), 32 So. 2d 826) has no application in this proceeding. This is so because the very statute

which authorizes validation proceedings requires that the state be made a party and that the state attorney make defense against the issuance of any bonds that have not been duly authorized. Section 75.05. In this proceeding the state is attacking the validity of the bonds on the grounds that the notice of reregistration was not published as required by law, that the election was not held in accordance with and did not comply with the constitution, and that a majority of the qualified freeholder electors did not participate in the election. In view of the statutory provision, the state may not — as an interested person might — be held to have waived the right to assert or held to be estopped from asserting that "the issuance of the bonds * * * has not been duly authorized." Any other construction of the statute would render meaningless the provisions requiring the state to be made a party to and the state attorney to make defense in bond validation proceedings.

Regardless of whether deficiencies and irregularities in connection with the notice of holding an election are cured by a full and fair election of which the electors had notice and in which a majority of those qualified actually participated (State v. City of Port St. Joe (Fla.), 47 So. 2d 584), there is a question of a more fundamental nature in this proceeding, namely — Under the applicable constitutional and statutory provisions which set of records (the permanent or the reregistration) shall be used to determine the number of qualified freeholder electors who were entitled to vote in the bond election?

As the evidence reflects, neither set was used to the exclusion of the other. If the reregistration statute had been complied with, the controlling figure would have been determined from the number shown on the reregistration records, as supplemented by the number who qualified at the polls under the provisions of section 100.241(2)(d). The supplemental number would have consisted of those reregistered electors *who were not shown as freeholders* and who presented to the inspectors at the polls proof of ownership of land as provided in said section. State v. Board of Public Instruction of Escambia County (Fla.), 113 So. 2d 368 text 371.

In this proceeding it appears that on November 3, 1959, just six days before the reregistration was commenced, the registration records reflected that there were 94,311 qualified freeholder electors in Duval County. In the absence of a valid reregistration, all of them were entitled to vote and the constitution of Florida mandatorily required that a majority of them participate in the election to determine whether bonds in the amount of $35,000,000

should be issued and estimated taxes of $60,223,585 levied to pay the principal of and interest on the bonds. (Pet. Ex. 9). On the other hand, if valid, the reregistration disqualified some 67,386 registered freeholders from voting in the bond election of December 22, 1959, or in any other "freeholder election" unless they again registered. In matters of such magnitude and consequence, it is essential to orderly government that the reregistration and the election be conducted according to established law, and procedure.

Under the constitution, the legislature — not the courts — prescribes the procedure to be followed in a reregistration to secure "a new and up-to-date list of freeholders" and in holding bond elections. The legislature has prescribed and the requirements are mandatory. The function of the courts is to interpret and enforce, and they are without power to amend or modify the constitution or the statutes of Florida. Being in sympathy with the object sought to be accomplished, and the need indicated by the circumstances cannot justify a court in "cast[ing] law and order to the discard and remov[ing] every restraint" imposed by the constitution and the statutes in connection with the issuance of bonds and levying taxes to pay the same. Universal Const. Co. v. Gore (Fla.), 51 So. 2d 429. In countless ordinary situations, the courts apply lawfully prescribed limitations and requirements respecting time, notice, process, and the quality and quantity of evidence. As they must do, they deny relief to those who have not proceeded within the time or in the manner prescribed by law; and, obviously, there can be no valid reason for approving less than the constitution and statutes require for the issuance of bonds and levying taxes to pay the same.

The absence of substantial compliance with the reregistration statute, and the opening of the election to those of the 94,311 previously qualified freeholders *who had not reregistered* compels the conclusion that the issuance of the bonds was not duly authorized in accordance with constitutional and statutory requirements; and that as a majority of the qualified freeholder electors did not participate, the election is abortive. State v. Barker, 121 Fla. 350, 163 So. 695; Board of Public Instruction for Escambia County v. State, 122 Fla. 19, 164 So. 516; Dixon v. City of Miami, 126 Fla. 249, 170 So. 845.

It is, therefore, ordered, adjudged and decreed that the petition to validate the $35,000,000 issue of bonds of Special Tax School District No. 1 be, and the same is hereby, denied, and said petition is dismissed.